**B.H. PAPASAN, Superintendent of Education, et al., Plaintiffs-Appellants,**

v.

**UNITED STATES of America, et al., Defendants-Appellees.**

No. 84–4109.

United States Court of Appeals, Fifth Circuit.

April 5, 1985.

Rehearing and Rehearing En Banc Denied May 21, 1985.

Freeland & Gafford, T.H. Freeland, III, T.H. Freeland, IV, Oxford, Miss., Orma R. Smith, Jr., Corinth, Miss., for plaintiffs-appellants.

William A. Allain, Atty. Gen., Richard Lloyd Arnold, Sp. Asst. Atty. Gen., Jackson, Miss., for State of Miss., et al.

Before THORNBERRY, REAVLEY and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A number of county school boards, superintendents of education, and individual schoolchildren in twenty-three Northern Mississippi counties attacked the administration of Mississippi's school lands trust in a suit against federal and state officials. The district court dismissed the complaint against the state defendants on limitations and Eleventh Amendment grounds and the claims against the federal defendants have since been abandoned. Finding all claims either insufficient under the Fourteenth Amendment or barred by the Eleventh Amendment, we affirm.

I

–1–

In its western expansion, the United States encouraged public education by granting school lands to newly-admitted states.[1] The Land Ordinance of 1785, which provided for the survey and sale of the Northwest Territory,[2] thus "reserved the lot No. 16, of every township, for the maintenance of public schools within the said township ..." 1 Laws of the United States 565 (1815).[3] Though title to Sixteenth Section land vested in the state upon approval of the federal survey, the state had a "binding and perpetual obligation to use the granted lands for the support of public education." *Andrus v. Utah*, 446 U.S. 500, 523, 100 S.Ct. 1803, 1815, 64 L.Ed.2d 458 (1980) (Powell, J., dissenting).

1. See *Andrus v. Utah*, 446 U.S. 500, 522–28, 100 S.Ct. 1803, 1814–17, 64 L.Ed.2d 458 (1980) (Powell, J., dissenting) for a historical overview of school land grants in this country.

2. The Northwest Territory included all of the land west of the original thirteen states, north of the Ohio River, east of the Mississippi River and south of Canada. Public Land Law Review Commission, History of Public Land Law Development, Ch. 1–3 (1968).

3. The Northwest Territory and all territory acquired thereafter was divided by survey into

townships of thirty-six numbered sections, each one square mile in area. "Sixteenth Section" land thus refers to section number sixteen, reserved in each township for public schools. The Northwest Ordinance of 1789, which provided for the government of the Northwest Territory, 1 Stat. 50, echoed the policy behind this reservation, declaring: "Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." 1 Stat. 52.

All proceeds from the sale or lease of such land were thus "impressed with a trust in favor of the public schools." *Id.* at 523–24, 100 S.Ct. at 1815. Hence the term, "school lands trust."

A similar history attends the land south of the Ohio River. Under its charter from England, Georgia held claim to most of what now comprises the states of Georgia, Alabama and Mississippi. In 1802, Georgia ceded these territories to the United States, on the condition that they would eventually attain statehood with the same privileges and rights granted the inhabitants of the Northwest Territory under the Northwest Ordinance of 1789.[4] In 1803, Congress provided for the survey and disposition of all lands south of the state of Tennessee to which Indian title had been extinguished. 2 Stat. 229 (1803). As with the Northwest Territory, Sixteenth Sections were reserved, 2 Stat. 229, Ch. 27, § 12 at 234 (1803), and their lease authorized, 3 Stat. 163 (1815), for the support of the public schools within each township.[5] In 1817, Congress authorized the formation of the State of Mississippi, 3 Stat. 348 (1817), the survey of its lands, and the reservation of Sixteenth Sections. 3 Stat. 375 (1817). "Title" to certain land in Northern Mississippi, however, remained in the Chickasaw

Indian Nation.[6] These Indian claims were not extinguished until 1832, when, pursuant to the Treaty of Pontotoc Creek, the Chickasaw Indians ceded all of their lands east of the Mississippi River to the United States. 7 Stat. 381 (1832).[7] Under this Treaty, all of the Chickasaw Cession lands were to be surveyed by the United States, and sold to private parties, with the proceeds to the Chickasaw Nation. Unlike other government land sales, however, no Sixteenth Section land was reserved from the sale of the Chickasaw lands. *See City of Corinth v. Robertson*, 125 Miss. 31, 87 So. 464 (1921).[8] This case has its genesis in that circumstance.

To remedy this deficiency, Congress, in 1836, authorized the selection of other unsold public land in the Chickasaw Cession, equal to and in lieu of the unreserved Sixteenth Sections. Once selected, these lands were to "vest in the State of Mississippi for the use of schools within said territory in said State." 5 Stat. 116, § 2 (1836).[9] After the Mississippi Legislature accepted the Chickasaw Cession Lieu Lands,[10] 1844 Miss.Laws Ch. LXVII at 238, it authorized their ninety-nine-year lease, "renewable forever," at a price not less than six dollars per acre, with the proceeds therefrom "to

---

**4.** *See* Articles of Cession and Agreement, April 24, 1802, V Territorial Papers of the United States, 142 (1802); 1802 Laws of Georgia, No. 35, art. 1, 5th Condition.

Earlier, in 1789, Congress established the Mississippi Territory, comprising what is now the southern two-thirds of Mississippi and Alabama, and provided that it be governed by the provisions of the Northwest Ordinance of 1789. 1 Stat. 549, 550, § 6 (1798). The Mississippi Territory was extended in 1804. 2 Stat. 303, § 7 (1804).

**5.** Because some of this Sixteenth Section land was subject to the prior claims of settlers and grantees, Congress authorized the Secretary of the Treasury to select substitute school lands in lieu of unavailable reserved sections. 2 Stat. 400, 401, § 6 (1806).

**6.** Apparently there was dispute in the court below as to whether any of the pre-1832 Acts of Congress reserving Sixteenth Section land for public schools applied to the Chickasaw Indian land. We need not face these issues here.

**7.** The *Chickasaw Cession* territory encompassed the twenty-three North Mississippi counties in

which the plaintiffs reside. These counties include: Alcorn, Benton, Calhoun, Chickasaw, Clay, Coahoma, DeSoto, Itawamba, Lafayette, Lee, Marshall, Monroe, Panola, Pontotoc, Prentiss, Quitman, Tate, Tippah, Tishomingo, Tunica, Union, Webster and Yalobusha Counties. Of these, Coahoma, Quitman, Webster and Yalobusha are only partly within the Cession.

**8.** All of the Chickasaw lands were sold despite the fact that the Treaty provided that the land would be surveyed and sold "in the same manner and on the same terms as other public lands...." Art. II, Treaty of Pontotoc Creek.

**9.** Though Congress originally authorized the Secretary of the Treasury to select lieu lands, it later allowed Mississippi's Governor to direct the selection. 5 Stat. 490 (1842).

**10.** The Chickasaw Cession Lieu Lands comprised some 174,555 acres located in the counties of Bolivar, Coahoma, Tallahatchie, Quitman, Panola and Leake.

be held in trust by said state for the use of schools in the Chickasaw Cession." 1848 Miss.Laws Ch. III at 62. In 1852, apparently to clarify Mississippi's authority to lease or sell its lieu land, *see Jones v. Madison County*, 72 Miss. 777, 794–95, 18 So. 87 (1895), Congress ratified all past leases and authorized the State to sell the lands for the support of the Chickasaw Cession schools. 10 Stat. 6 (1852). The Mississippi Legislature then authorized the fee sale of the Chickasaw Cession Lieu Lands and directed that the sales proceeds be invested in eight percent loans to the State's railroads. 1856 Miss.Laws Ch. LVI. Most of the investment was lost when the railroads were destroyed in the Civil War.

Since then, the Mississippi Legislature has appropriated monies to replace the interest lost on its failed investment, *see* 1878 Miss.Laws, Ch. IX at 86, first at eight and later at six percent. *See* Miss. Const. Art. VIII, § 212 (1890). These funds are paid each year to the Chickasaw Cession counties for the support of their public schools in lieu of the returns on the unreserved Sixteenth Section lands or the ill-disposed Lieu Lands. Under this current system, the highest annual receipt from the lieu land appropriation in the Chickasaw Cession in 1980 was $4,586.72 or $.80 per student, as compared to the $69,112.34 or $31.25 per pupil average realized from the school lands trusts in other Mississippi counties.

–2–

Plaintiffs and intervenors here include a group of county school boards, superintendents of education, and individual school children, all residing in the Chickasaw Cession counties in North Mississippi.[11] In June of 1981, these plaintiffs sued certain

federal and state officials attacking the difference between the school lands appropriations to the Chickasaw Cession and the monies paid to other schools from trust funds. The state defendants include the State of Mississippi, its Governor, the Secretary and Assistant Secretary of State, the Superintendent of Education, and members of the State Board of Education and the Lieu Land Commission, sued in official and successor capacities.

The complaint chronicled purported "illegalities" dating back to the Northwest Ordinance of 1785. It sought a declaratory judgment that various federal acts and treaties, as well as certain Mississippi enactments, were "unlawful, void, and unenforceable" insofar as they purported to authorize the sale of the Chickasaw Cession Sixteenth Section Lands or Lieu Lands. The complaint also alleged that both the federal and state defendants had breached perpetual and binding obligations of the school lands trust. The claims against the federal defendants were specifically based on breach of promise to fund the Chickasaw Cession trust and failure to prevent the State of Mississippi from wasting trust property. The State defendants allegedly breached their trust duties by improperly investing the proceeds from the unlawful sale of the Chickasaw Cession Lieu Lands. The complaint also alleged a claim under 42 U.S.C. § 1983, asserting that the State violated both the due process and equal protection guarantees of the Fourteenth Amendment by allotting the Chickasaw Cession counties disproportionate school lands appropriations, thereby depriving their schoolchildren of a "minimally adequate level of education."[12]

---

**11.** The plaintiffs also sought to bring the action as a class, defined as

All children residing in the counties within the Chickasaw Cession Territory in Northern Mississippi, who are of school age or who may become of school age (including children not yet in being) and all children residing in said Territory and who may in the future become of school age and all children who at this time are attending or who may in the future attend the public schools in any of said

school districts and counties within the Chickasaw Cession Territory.

The district court held the motion for class certification in abeyance pending resolution of the defendants' motions to dismiss.

**12.** The complaint also alleged constitutional claims under the contract clauses of the Mississippi and United States Constitutions, the Fifth Amendment's prohibition against taking without just compensation, and the Ninth Amendment.

The complaint prayed for a wide range of relief, including a "conveyance of . . . real and/or personal property (including money) of equivalent income producing value" to the Chickasaw Cession Sixteenth Sections and/or Lieu Lands and asked that the defendants "acquire, set aside and make available" new lieu lands. Additionally, the plaintiffs sought to "enjoin" and "direct" the defendants to establish "a fund or funds of such value" as was reasonably necessary to provide "hereafter" and "in perpetuity" annual income to the Chickasaw Cession school districts at an "equitable and just" level, equivalent to what the Chickasaw Cession districts would enjoy if the State still owned the unlawfully sold land. The plaintiffs also sought to be "compensate[d] and ma[d]e whole" for the income and interest lost through imprudent trust management from 1832 to the present. Finally, the plaintiffs requested that the defendants take whatever other steps were reasonably necessary to "[e]liminate and compensate and for the future guarantee and protect plaintiffs and the plaintiff class against . . . denials and deprivations of their rights to due process of law and to the equal protection of the laws," and then to "[d]evelop, prepare and file with the Court . . . a plan for the orderly implementation of the declaratory and injunctive relief otherwise granted."

After "accepting as true all factual allegations made by plaintiffs," the district court granted all motions to dismiss. The court held the claims against the federal defendants barred by sovereign immunity, laches, and statutes of limitations. This order dismissing the federal defendants is not before us, as its appeal has been dismissed by joint stipulation. By separate order, the district court also dismissed the action against the state defendants. The court held that all of the state actions complained of were before the expiration of any applicable statute of limitations and that "any monetary remedy [was] barred by the Eleventh Amendment to the United

States Constitution." The district court held that under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), it lacked jurisdiction to entertain any "viable equal protection claim for relief *in futuro*" under the Mississippi Constitution and that any such claim was "likewise barred by the Eleventh Amendment because the only possible relief could come only from a monetary award against the state treasury." Plaintiffs appeal the dismissal of their claims against the state defendants.

## II

The state defendants defend the order dismissing them on Eleventh Amendment grounds, urging that the suit was against the State of Mississippi itself over which the federal court lacked jurisdiction; that while state officers were nominally sued in their official capacities, the State was the real party in interest. The argument continues that regardless of how characterized, the requested "dollars or dirt" relief would inevitably expend itself on the public treasury. We agree.

–1–

The Eleventh Amendment is a jurisdictional bar to federal court suit by private citizens against a state. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Chiz's Motel & Restaurant, Inc. v. Mississippi State Tax Commission*, 750 F.2d 1305, 1307 (5th Cir.1985). In the absence of express consent,[13] the Eleventh Amendment proscribes suits in federal court against the state and its agencies, regardless of the type of relief sought. *Pennhurst*, 104 S.Ct. at 908. The district court thus correctly dismissed the complaint insofar as it sought relief directly from the State.

–2–

The Eleventh Amendment also reaches claims against state officers when

---

**13.** Mississippi has expressly preserved its immunity from suit in federal court. *See* 1984 Miss. Laws ch. 495, § 3(4).

they are nominal defendants and the state is "the real substantial party in interest." *Ford Motor Company v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). The state is the real party in interest when the relief sought would operate against the sovereign by expending itself on state coffers. *Pennhurst*, 104 S.Ct. at 908–09; *Quern v. Jordan*, 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979); *Edelman*, 415 U.S. at 663–64, 94 S.Ct. at 1355–56. Thus, the Eleventh Amendment disables a federal court from awarding retroactive "monetary relief from the state in the form of compensatory damages, punitive damages, or *monetary awards in the nature of equitable restitution....*" *Clay v. Texas Women's University*, 728 F.2d 714, 715 (5th Cir.1984) (emphasis added). *See also Chiz's Motel*, 750 F.2d at 1307; *Emory v. Texas State Board of Medical Examiners*, 748 F.2d 1023, 1025 (5th Cir.1984); *Karpovs v. State of Mississippi*, 663 F.2d 640, 643 (5th Cir.1981).

■ The complaint here sought monetary relief as compensation or restitution for past wrongs. It was cast in the language of damages, seeking "[f]irst and foremost ... the establishment of a trust fund ... or an order for an annual legislative appropriation in an amount necessary to make whole Plaintiffs...." As a means to this end, it prayed for the conveyance of property, "including money," equivalent in value to the lost Sixteenth Section lands or the unlawfully sold lieu lands. It requested that a fund be established "to compensate, reimburse and make restitution to each of said school districts" for all of the income and interest they each would have received "from 1832 until the present" if such lands had been available and subjected to prudent trust management. The complaint also asked that new lieu lands be "acquire[d], set aside and ma[d]e available for the use and benefit of Plaintiffs" and their class. Such relief was retroactive in character and satisfiable only from the Mississippi treasury.

–3–

Plaintiffs concede that the district court correctly dismissed their suit insofar as it sought retroactive monetary relief. They argue, however, that because they also sought prospective injunctive relief against state officials alleged to have acted unconstitutionally or in violation of federal law, *Pennhurst*, 104 S.Ct. at 909; *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), it was error to dismiss the suit in its entirety. *See ACLU of Mississippi v. Finch*, 638 F.2d 1336, 1341 (5th Cir.1981); *Gay Student Services v. Texas A & M University*, 612 F.2d 160, 164–65 (5th Cir.), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980).

The complaint alleged that the state defendants denied rights secured by the Congress and the Constitution. The first claim is that the United States, in granting Mississippi the Chickasaw Cession Lieu Lands, imposed a binding and perpetual trust obligation on the State as trustee to administer the lands in support of public education, and that the lieu land mismanagement breached the fiduciary duties assumed when the lieu lands were set aside by the federal government and accepted by the State. *See Andrus*, 446 U.S. at 507, 100 S.Ct. at 1807 (school lands grant a "solemn agreement"); *id.* at 523, 100 S.Ct. at 1815 (Powell, J. dissenting) (federal land grant imposes "binding and perpetual obligation" on state); *Lassen v. Arizona Highway Department*, 385 U.S. 458, 460, 87 S.Ct. 584, 585, 17 L.Ed.2d 515 (1967) ("United States has a continuing interest in the administration of both the lands and the funds which derive from them"). *See also United States v. 111.2 Acres of Land in Ferry County, Washington*, 293 F.Supp. 1042, 1049 (E.D.Wash.1968), *aff'd*, 435 F.2d 561 (9th Cir.1970). The State replies that the school lands grant was an absolute gift to the State to deal with as it pleased and creating no federal legal obligation. *See Alabama v. Schmidt*, 232 U.S. 168, 173–74, 34 S.Ct. 301, 302, 58 L.Ed. 555 (1914); *Cooper v. Roberts*, 59 U.S. (18 How.) 173, 15 L.Ed. 338 (1855) (public land grant imposes merely "honorary" obligations).

■ It matters little how we characterize Mississippi's school lands trust obligations. Assuming that a binding federal compact was created and breached over a century ago, the federal courts have no jurisdiction to address the breach, given the nature of the relief sought. To the extent that the defendants' management of the Chickasaw Cession Lieu Lands violated the Mississippi law of trusts, *see Tally v. Carter*, 318 So.2d 835, 838 (Miss.1975) (Sixteenth Section land held in trust by state); *Keys v. Carter*, 318 So.2d 862, 864 (Miss.1975) (rules applicable to trusts and trust property generally apply to school lands); *Holmes v. Jones*, 318 So.2d 865, 869 (Miss. 1975) (applying Mississippi fiduciary law to school lands suit), the complaint is likewise proscribed. The Eleventh Amendment deprives a federal court of pendent jurisdiction over state law claims regardless of the type of requested relief. *Pennhurst*, 104 S.Ct. at 908; *Kitchens v. Texas Department of Human Resources*, 747 F.2d 985 (5th Cir.1984).

The complaint also alleged that the failure to provide the Chickasaw Cession school districts with funding equivalent to that received by districts in the rest of the state violated the equal protection clause of the Fourteenth Amendment "by creating a distinction without rational basis or substantial justification." Such unconstitutional action, plaintiffs contend, stripped the state defendants of any official or representative character and thus of any Eleventh Amendment immunity. *Ex parte Young*, 209 U.S. at 160, 28 S.Ct. at 454; *Finch*, 638 F.2d at 1340. They argue that in addition to restitution, they sought to *prospectively* enjoin the continuing and allegedly unlawful administration by the defendants of Mississippi's school lands appropriations. Such prospective relief, they continue, is constitutionally permissible, even though it may have a costly ancillary effect on the state treasury.

■ A federal court can enjoin state officials to correct a constitutional deficiency or eliminate an unconstitutional status even though expenditures incident to that order will expend themselves on the public treasury. *See Milliken v. Bradley*, 433 U.S. 267, 289, 97 S.Ct. 2749, 2761, 53 L.Ed.2d 745 (1977); *Edelman*, 415 U.S. at 667–68, 94 S.Ct. at 1357–58; *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The fact that a complaint is phrased in declaratory or injunctive terms, however, is not dispositive. A court must scrutinize the pleadings to determine what in essence is sought, for "the federal court may award an injunction that governs the official's future conduct, *but not one that awards retroactive monetary relief.*" *Pennhurst*, 104 S.Ct. at 909 (emphasis added).

The complaint sought to "enjoin" and "direct" the defendants to provide plaintiffs "hereafter" and "in perpetuity" annual income equivalent to what the Chickasaw Cession schools would enjoy if the lieu lands had not been sold and the proceeds improperly invested. Such relief is the type of equitable restitution condemned in *Edelman*. 415 U.S. at 668, 94 S.Ct. at 1358. Like the *Edelman* injunction, the relief sought here "requires the payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation," *id.*, for legal breaches which occurred more than one hundred and fifty years ago. The complaint particularized no remedy other than ordering the State to convey land or funds. Such relief certainly would have more than an ancillary effect on the state treasury.

But a federal court should not dismiss a constitutional complaint because it "seeks one remedy rather than another plainly appropriate one." *Holt Civic Club v. Tuscaloosa*, 439 U.S. 60, 65, 99 S.Ct. 383, 387, 58 L.Ed.2d 292 (1978). Giving the complaint the generous reading due, we can postulate a prospective non-compensatory remedy that arguably flanks the Eleventh Amendment. That claim would shift in focus from the past maladministration of the trust to the present difference in income

distributions. By necessity, it would rest on elimination of a perceived presently existing unconstitutional status, such as a prison so inadequate as to violate the Eighth Amendment.[14] But, there is no present unconstitutional status to rectify. "While a meritorious claim will not be rejected for want of a prayer for appropriate relief, a claim lacking substantive merit obviously should be rejected." *See Id.* at 66, 99 S.Ct. at 387.

 The only arguable current unconstitutional status is the difference between the school lands appropriations to the Chickasaw and to the non-Chickasaw Cession counties. While it is claimed that the difference deprived the schoolchildren of their "right" to a minimally adequate level of education, the plaintiffs admit that they have not sustained an absolute deprivation of educational opportunity. *Cf. Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). The complaint is not that the Mississippi Legislature decides each year to grant the children in the southern counties of the state $31.25 per student, while limiting per pupil appropriations to the Chickasaw Cession to $.80. The southern Mississippi counties still derive income from existing Sixteenth Section or Lieu Lands. School lands appropriations vary even among the southern counties, due to differences in the current values of their lands and the relative financial skills of the local trust administrators.[15] Plaintiffs' argument is then by necessity, that their receipt of less school lands money than that received by southern counties reduces the quality of education below that provided children in non-Chickasaw Cession districts. Apart from the fact that there is no necessary correspondence between the amount of money spent and the quality of education, such a funding difference is not a denial of equal protection unless it lacks a rational basis. *San Antonio Indepen-*

*dent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). That rationality is found in the state's structure of school finances. With land values as a base and desired local administration of local schools, income differences are inevitable.

Part of the income difference here is attributed to the historical fact that there are no school lands in the Chickasaw Cession to be administered. As we earlier recounted, they were sold and the proceeds invested in the Mississippi railroads that were destroyed in the Civil War. Since 1878, the State has attempted to remedy this bad investment by annual appropriations to the Cession counties of funds equivalent to six percent of the Lieu Land proceeds loaned to the railroads. The State's failure to adjust these appropriations to keep step with rising inflation over one hundred and fifty years is no violation of equal protection. The State has continued, however, inadequately, to attempt to remedy the consequences of its ill-fated investment. In pursuing this legitimate, remedial goal, the State need not achieve complete success. *New Orleans v. Dukes,* 427 U.S. 297, 305, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955).

When the overlay of the Civil War loss of a revenue source is removed, we are left with an equal protection attack upon Mississippi's financing of public education. We cannot in a material way distinguish this claim from that rejected in *Rodriguez.*

–4–

Plaintiffs advance two other arguments to support their claim that the Eleventh Amendment is inapplicable. They first contend that the school board plaintiffs are arms of the State authorized to enforce claims belonging to Mississippi as trustee without jurisdictional impediment. They

---

14. The plaintiffs point to such prison condition cases in support of their argument. *See, e.g., Williams v. Edward,* 547 F.2d 1206, 1213 (5th Cir.1977); *Nadeau v. Helgemoe,* 561 F.2d 411, 419 n. 7 (1st Cir.1977).

15. Miss.Code Ann. § 29–3–1 *et seq.* (Supp.1983) designates local boards of education as the managers of the school lands under the general supervision of the state land commissioner.

then argue that the policies underlying the school lands trust agreements impliedly override any Eleventh Amendment immunity. Both contentions are without merit.

We do not reach the merit of plaintiffs' first argument because county school districts are not arms of the State. We have held that under applicable state law, the county school systems in Mississippi are primarily local institutions not entitled to Eleventh Amendment protection. *Adams v. Rankin County Board of Education,* 524 F.2d 928, 929 (5th Cir.1975), *cert. denied,* 438 U.S. 904, 98 S.Ct. 3121, 57 L.Ed.2d 1146 (1978).[16] *Cf. Jagnandon v. Giles,* 538 F.2d 1166, 1174 (5th Cir.1976), *cert. denied,* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083 (1977) (Mississippi State University is an arm of state). *See also Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ("state" does not include political subdivisions, which under Ohio law, encompassed school districts and boards). The county school boards were thus "citizens" within the meaning of the Eleventh Amendment. *See County of Monroe v. State of Florida,* 678 F.2d 1124, 1130–31 (2d Cir.1982), *cert. denied,* 459 U.S. 1104, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983).

The plaintiffs also argue that Mississippi has impliedly waived its constitutional immunity to federal court suit by virtue of the educational and land grant policies underlying the eighteenth century Acts of Congress which created the school lands trusts. Such implied consent, however, requires that a state enter into a federally-regulated sphere where a private cause of action is provided for violation of a federal regulatory statute. Congress must also expressly indicate that the private remedy is applicable to the states. *Employees of the Department of Public Health and Welfare v. Department of Public Health and Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). The plaintiffs point to no federally-created private claim regarding Sixteenth Section trusts. Nor is there any indication that Congress has expressly abrogated a state's Eleventh Amendment protection in this area.

### III

We agree with the district court that regardless of how the plaintiffs characterized their action, "the only possible relief could [have] come only from a monetary award against the state treasury." Insofar as plaintiffs sought to remedy an asserted unconstitutional status under the Fourteenth Amendment, they stated no claim. The court lacked jurisdiction over their other claims. We do not reach the question of whether the suit was barred by relevant periods of limitation. Dismissal of the complaint is AFFIRMED.

---

16. Though the question of whether an entity is an arm of the state for Eleventh Amendment purposes is one of federal law, "federal courts must examine the powers, characteristics, and relationships created by state law" to determine if an action is really one against a "state." *Han-*

*der v. San Jacinto Junior College,* 519 F.2d 273, 279–80, *clarified,* 522 F.2d 204, 205 (5th Cir. 1975) (under Texas law, school districts are independent political corporations distinct from state itself).