481 So.2d 770 (1985)
Steven D. TURNEY, et ux
v.
MARION COUNTY BOARD OF EDUCATION and William A. Stafford, Superintendent of Education.
No. 55764.
Supreme Court of Mississippi.
November 27, 1985.
*772 S. Wayne Easterling, Easterling & Varnado, Hattiesburg, for appellants.
Fred L. Cooper, Columbia, for appellees.
Before ROY NOBLE LEE, P.J., and DAN M. LEE and PRATHER, JJ.
PRATHER, Justice, for the Court:
The legal authority of a county board of education in managing sixteenth section public school land is challenged in this appeal from the Chancery Court of Marion County. Steven and Michelle Turney, appellants and lessees of sixteenth section school land, claimed that re-lease rent calculations were incorrectly made and that the Marion County Board of Education, appellee, had no authority to require them *773 to sign a lease. From the chancellor's adverse ruling, the Turneys appeal and assign as error the following:
(1) The trial court erred in failing to recognize the 1982 lease that was recorded in the chancery clerk's office;
(2) The board of education was not authorized to draw up an additional lease without a request therefor being made by applicant pursuant to § 29-3-82;
(3) The school board was not authorized to demand that appellants sign the lease;
(4) The school board was not authorized to impose the conditions demanded in the lease;
(5) The defendants incorrectly determined the dollar amount of the rental.

I.
Steven and Michelle Turney were the holders of a lease on a thirty-one acre tract of sixteenth section land in Marion County. Based on usage, the land is classified by the County Board of Education as "farm-residential." Before their original lease terminated in 1982, the Turneys applied for a renewal, and the Marion County Board of Education had the land reappraised. The new appraisal resulted in an appraised rental value of $11.25 per acre. The appraisal method was the subject of a former appeal to this Court by the same parties. Barber v. Turney, 423 So.2d 133 (Miss. 1982).
Pursuant to that court decision, the Marion County Board of Education employed two appraisers to reappraise the fair market rental value of the subject land. In 1983 a new lease was submitted to the Turneys by the Board. The 1983 lease was properly signed by the Superintendent of Education and the presidents of the Board of Education and the Board of Supervisors. The lease contained new lease provisions including a new rental amount of $5.25 per acre. Other than the 1982 application, no new application for re-lease was ever submitted by the Turneys. The Turneys refused to sign the new contract and brought the action that resulted in this appeal.
In the trial court the Turneys complained that the Board of Education had improperly determined the rental amount and that the Board of Education had exceeded its lawful authority in requiring the Turneys to sign the new lease. The chancellor found, in summary, that:
(1) The Board properly determined the rental amount;
(2) The Board did not exceed its lawful authority to sign what was not an excessively burdensome lease;
(3) The Turneys had twenty additional days to exercise their prior right to re-lease the thirty-one acres in question by signing the lease offered by the Board and their failure to do so would cancel the lease and authorize the Board to lease the land elsewhere.

II.
This appeal deals with sixteenth section school trust lands. Of benefit to the reader may be a brief summary of the history of the development of this trust, a history which antedates the formation of the State of Mississippi. Such a history is contained in Papasan v. United States, 756 F.2d 1087 (5th Cir.1985). (See Appendix for a partial text of Papasan v. United States, concerning the history of sixteenth section school lands.)

III.
This appeal basically challenges the authority of the Board of Education in its management of sixteenth section school lands. The first four assignments of error address an alleged usurpation of authority.
First, did the trial court err in failing to recognize the 1982 recorded lease which was the subject of the prior appeal?
The Turneys adhere to the position that the prior 1982 recorded lease remains in full force and effect, subject to judicial review of the methodology utilized in establishing the rental amount. Arguing that the validity of the 1982 lease has never been in question, the Turneys contend that *774 the Board of Education is bound by the stipulation it made in the prior suit that the lease was valid. The Turneys further contend that the 1982 lease is prima facie valid because it was executed and recorded in substantial conformity with Miss. Code Ann. § 29-3-82 (Supp. 1984).
Appellees, on the other hand, contend the 1982 lease is void because it was not signed by the appellants. The Board is presently requiring the lessee to sign the new proposed lease.
A comprehensive discussion of the law on signature requirement is found in 17 C.J.S. Contracts § 62 (1963) which, as cited in McInnis v. Southeastern Automatic Sprinkler Co., 233 So.2d 219 (Miss. 1970), reads in pertinent part:
Ordinarily one of the acts forming part of the execution of a written contract is the signing of it, and the mere fact that a written instrument purports to be an agreement does not constitute it a binding contract where it is not signed. However, signature is not always essential to the binding force of an agreement, and whether a writing constitutes a binding contract even though it is not signed or whether the signing of the instrument is a condition precedent to its becoming a binding contract usually depends on the intention of the parties. The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, as, for example, by the acts or conduct of the parties.
17 C.J.S. Contracts § 62 (1963) goes on to read in part:
The question as to whether those who have signed are bound is generally to be determined by the intention and understanding of the parties at the time of the execution of the instrument. The reason for holding the instrument void is that it was intended that all the parties should execute it and that each executes it on the implied condition that it is to be executed by the others, and, therefore, that until executed by all it is inchoate and incomplete and never takes effect as a valid contract, and this is especially true where the agreement expressly provides, or its manifest intent is, that it is not to be binding until signed.
The common thread running through both of the above-quoted passages deals with the intent of the parties. Whether an unsigned writing constitutes a binding contract depends upon the intention of the parties. Collins v. Swope, 605 S.W.2d 538 (Mo. Ct. App. 1980).
In the present case the Turneys chose not to sign the 1982 lease because they did not agree with the terms contained therein. Steve Turney testified regarding the 1982 lease:
And since I felt the lease was illegal, deceptive and threatening, that since I had submitted my application and agreed to the amount of time and the amount of dollars, and to abide by the law, that I would prefer not to sign a lease that I felt was not in good standing.
It is obvious from the testimony of Steven Turney that he wanted to use the land, but he did not want to be obligated to the terms of the lease contract which gave him possession of the land. His testimony indicated lack of mutuality, lack of assent, and lack of willingness to be bound by the contract he now claims is valid.
Because of this apparent lack of intent to be bound, the chancellor committed no error in not recognizing the 1982 lease, and in supporting the Board's requirement of the lessees' signatures.

IV.
Was the Board of Education authorized to draw up an additional lease without a request therefor being made by the Turneys?
The thrust of appellants' argument under this assignment of error is that the Board was not authorized to draw the 1983 lease because the 1983 lease was not requested by the appellants. Appellants base this contention on Miss. Code Ann. § 29-3-82(a) (Supp. 1984) which reads, "Any present leaseholder who desires to *775 renew his lease, or any person who desires to lease sixteenth section or lieu lands, shall make application to the superintendent of education."
While § 29-3-82(a) describes the process by which present leaseholders renew their leases, it does not purport to impose the kind of limitations on the board of education that the appellants contend. Appellants' contention seems frivolous in light of the circumstances leading up to this case.

V.
Was the Board authorized to require the Turneys' signature on the 1983 lease?
The question posed here is whether the Board of Education may impose requirements of the lessee not specifically addressed by the empowering statute. Appellants contend that the Marion County Board of Education does not have the authority to require them to sign the 1983 lease agreement. Appellants rely on Miss. Code Ann. § 29-3-82 (Supp. 1984) which requires the following for the lease of sixteenth section property not classified as agricultural land:
(a) Any present leaseholder who desires to renew his lease, or any person who desires to lease sixteenth section or lieu lands, shall make application to the superintendent of education.
(b) Upon receipt of an application for the lease of such lands, the superintendent of education shall promptly give consideration to the application and he shall record his recommendation in writing and present it to the board of education at the next regular meeting of the board.
(c) The board of education at its meeting, shall consider the application and recommendation of the superintendent of education and may receive any other information which it considers bearing upon the approval of the application and lease of such land. Within thirty (30) days of the receipt of an application, the board shall act on the application and if such action is favorable, the board of education shall submit to the superintendent of education a suggested lease agreement.
(d) The superintendent of education shall then present the lease to the board of supervisors of the county where such land is located. Within thirty (30) days of the receipt of the lease, the board of supervisors shall accept or reject the proposed rental amount.
(e) If the board of supervisors accepts the lease as proposed by the board of education, the superintendent of education shall execute the lease to the applicant under the terms and conditions set forth in the lease.
(f) If the board of supervisors refuses to accept the rental value set by the board of education in the proposed lease, the rental value of the lease shall be determined under the provisions set forth in section 29-3-1(2).
(g) All sixteenth section or lieu land leases shall be reduced to writing and signed in triplicate by the president of the board of supervisors, the president of the board of education and the superintendent of education. The chancery clerk shall certify one (1) copy of the lease to the superintendent of education and one (1) copy to the state land commissioner, and shall record the original on the deed records of the county, abstract the lease as a mesne conveyance, and record it on the minutes of the board of supervisors. The chancery clerk shall charge and collect from the lessee the full recording fees.
Section 29-3-82 is silent regarding the requirement that the lessee sign the lease. Furthermore, Attorney General Opinion 80-12 states, "It is not necessary for the lessee to sign the lease so long as there is a properly executed lease by the board."
To the contrary, appellees cite three Mississippi Code Sections as authority for their contention that the lessee must sign the lease.
First, the appellees cite Miss. Code Ann. § 89-1-3 (1972) which requires conveyances of land and estates for a term of more *776 than one year, to be in writing and signed. That section states:
An estate of inheritance or freehold, or for a term of more than one year, in lands shall not be conveyed from one to another unless the conveyance be declared by writing signed and delivered.
Second, appellees cite Miss. Code Ann. § 15-3-1(c) (1972) which requires a lease of more than one year to be in writing and signed by the party to be charged therewith. That section provides in pertinent part:
An action shall not be brought whereby to charge a defendant or other party:
.....
(c) upon any contract for ... the making of any lease thereof for a longer term than one year;
.....
unless, in each of said cases, the promise or agreement upon which such action may be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith or signed by some person by him or her thereunto lawfully authorized in writing.
Finally, appellees cite Miss. Code Ann. § 89-3-1 (1972) which requires an acknowledgment of the execution of a lease before recordation in the public records. That section provides in part:
[A] written instrument ... for a term of years, .. . shall not be admitted to record in the clerk's office unless the execution thereof be first acknowledged or proved, and the acknowledgment or proof duly certified by an officer competent to take the same in the manner directed by this chapter; and any such instrument which is admitted to record without such acknowledgment or proof shall not be notice to creditors or subsequent purchasers for valuable consideration.
The Court agrees with appellee that these statutory provisions are pertinent to its requirement that the lessee sign the lease. But in addition, Miss. Code Ann. § 29-3-1(1) (Supp. 1984) grants the Board of Education that authority.
The Board of Education derives its authority to manage sixteenth section land from Miss. Code Ann. § 29-3-1(1) which reads:
Sixteenth section school lands, or lands granted in lieu thereof, constitute property held in trust for the benefit of the public schools and must be treated as such. The board of education under the general supervision of the state land commissioner, shall have control and jurisdiction of said school trust lands and of all funds arising from any disposition thereof heretofore or hereafter made. It shall be the duty of the board of education to manage the school trust lands and all funds arising therefrom as trust property. Accordingly, the board shall assure that adequate compensation is received for all uses of the trust lands, except for uses by the public schools.
It is clear from a reading of the history of sixteenth section lands, along with the above-quoted statute, that various governmental authorities are involved with federally donated trust lands. The lands were granted by the United States to Mississippi in trust, but the United States "has a continuing interest in the administration of both the lands and the funds which derive from them. The grant involved here thus expressly requires the Attorney General of the United States to maintain whatever proceedings may be necessary to enforce its terms." Lassen v. Arizona, 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed. 515 (1967). Title to the trust lands rests in the State of Mississippi as trustee. The state official responsible for Mississippi's public lands is presently the Secretary of State.
The Court notes that Miss. Code Ann. § 29-3-1 (Supp. 1984) gives general supervisory power to the state land commissioner. However, the office of state land commissioner was abolished January 1, 1980 by Miss. Code Ann. § 7-11-2 (Supp. 1984), with all the duties and responsibilities of that office transferred to the office of the Secretary of State. Today, pursuant to Miss. *777 Code Ann. § 7-11-11 (Supp. 1984) the Secretary of State has charge of the public lands. Section 7-11-11 states:
The secretary of state shall have charge of the swamp and the overflowed lands and indemnity lands in lieu thereof, the internal improvement lands, the lands forfeited to the state for nonpayment of taxes after the time allowed by law for redemption shall have expired, and of all other public lands belonging to or under the control of the state. The regulation, sale and disposition of all such lands shall be made through the secretary of state's office.
The secretary of state shall sign all conveyances and leases of any and all state-owned lands and shall record same in a book kept in his office for such purposes.
The State, as trustee, may not divest itself of its duties. However, the State, by statute, may vest in others the authority to do acts which the trustee cannot practicably be expected to perform. Restatement (Second) of Trusts § 171 (1959). The State, as a matter of practical necessity, manages its sixteenth section trust property through local county boards of education. As Miss. Code Ann. § 29-3-1 relates, "The board of education ... shall have control and jurisdiction of said school trust lands and of all funds arising from any disposition thereof heretofore or hereafter made." The charge of the statute is that Boards of Education manage the school trust lands "as trust property" and "assure that adequate compensation is received." Even though the State has vested in the local boards of education certain management powers and duties, the State at all times holds the fee as trustee and maintains the authority and responsibility to oversee the management of the trust and to assure that the trust is properly executed.
Under this trust arrangement, the inhabitants of the respective townships are the beneficiaries of the trust. Jones v. Madison County, 72 Miss. 777, 18 So. 87 (1895). Since the Northwest Territory Ordinance of 1785 it has been clear that the sole use to which the income of the trust may be put is "the maintenance of public schools within the said township... ." 1 Laws of the United States 565 (1815). Miss. Code Ann. § 29-3-1(1) (Supp. 1984). Therefore, in the context of sixteenth section land, the term "inhabitants" and the term "public schools" have come to be used interchangeably.
Thus the federal, state, and local governmental bodies are authorized by either the original trust agreement or by subsequent statutory authorization to enforce the provision of the trust.
Returning now to the School Board's management powers, the empowering statute does not detail the Board's specific authority, but creates a general charge that the lands be managed "as trust property." This direction necessarily assumes that the Board has authority to perform all actions necessary, lawful, and proper to perform its statutory duty. The use of the phrase "as trust property" recognizes that the Board may exercise the general powers of a trustee with the same general restrictions and general liabilities of a trustee.
As to the standard of care chargeable to the Board in the performance of its statutory duty to act as a trustee, this Court holds that the same standard of care applicable to a general trustee applies to the Board of Education. This standard is expressed as follows:
Ordinary care, skill, and prudence are normally required of trustees in the performance of all their duties, unless the trust instrument provides otherwise. The rule is "that trustees are bound in the management of all the matters of the trust to act in good faith and employ such vigilance, sagacity, diligence and prudence as in general prudent [persons] of discretion and intelligence in like matters employ in their own affairs. The law does not hold a trustee, acting in accord with such rule, responsible for errors of judgment." "All that equity *778 requires from trustees is common skill, common prudence, and common caution." [Footnotes omitted]
Bogert, Law of Trusts, § 93 (5th ed. 1973) See also, Scott, Scott on Trusts, § 174 (3rd ed. 1967).
Applying to this case the general standard to exercise care and skill that a person of ordinary prudence would exercise in dealing with his or her own property, this Court holds that the Board of Education may require its lessees of sixteenth section land to sign its leases. This Court further holds that the Board of Education may include terms in the leases that persons of ordinary prudence would include. The signature requirement is a reasonable demand, and it is fully justified, by implication, by § 29-3-1(1). As noted in section II of this opinion, the testimony of Mr. Turney indicated his lack of assent. In requiring the lessees' signature, the Board exercised the care and skill of an ordinary prudent person to protect the beneficiaries of the trust. There is no merit to this assignment of error.

VI.
Was the Board of Education authorized to impose the conditions demanded in the lease?
Under their fourth assignment of error, appellants contend that the Marion County Board of Education exceeded its authority by including provisions in the 1983 lease which were violative of appellant's constitutional and statutory rights. Appellants take particular exception to paragraphs 3, 6, 7, 8, 9, 10, and 11.

A.
Paragraph 3 of the lease provides in part:
(3) During the twelfth year of this lease, the Lessor may, at its option, upon 30 days written notice to Lessee, elect to have a reappraisal of the subject property and a redetermination of reasonable annual ground rentals. In the event Lessor makes such election, there shall be a reappraisal of the fee value of the property under lease, less improvements. The reappraisal shall establish the fair market value of the property and establish a reasonable current percentage of income on real estate investments for the purposes of determining fair annual ground rental. The amount of rent so determined as of this date shall be paid for the remaining years.
(a) Any adjustments of annual ground rental determined by the above mentioned statutory appraisal procedure shall be binding upon the Lessor and Lessee.
(b) Should the statutory procedure of determining annual ground rentals result in an increase, over and above the initial ground rentals determined at the beginning of this lease or the preceding twelve year interval, Lessee, within 90 days after receiving notice of the increase, shall have the additional right to request appraisals by three qualified MAI or SREA appraisers to be appointed in the following manner:
.....
(d) In the event the Lessee requests that the three additional appraisals be made, such appraisals shall be made at the Lessee's expense.
.....
Appellants have three complaints about paragraph 3. First, appellants contend that paragraph 3 demands that the Turneys consent to the very opposite of what was previously decided in Barber v. Turney, 423 So.2d 133 (Miss. 1982). In Barber, the Board of Education contended that it was statutorily obligated to charge rent of 5% of the fair market sales price of the land.[1] This Court held that:
[T]he Board has the final authority, duty and responsibility to determine the reasonable annual rental amount to be assessed on sixteenth section lands, and it is not bound by a percentage of fair market sale value or fair market rental *779 value of the land. [Footnote omitted]. The Board is simply required to lease the sixteenth section land for the fair rental value thereof. [Emphasis added].
Barber, 423 So.2d at 135.
Barber did not hold that the Board is precluded from using the percentage of fair market sale value method if that method best yields fair rental value. Barber simply holds that the Board is not bound to use that method. The Board may choose its own method of valuation as long as the evaluation results in the fair market rental value of the subject land.
Although the terminology of paragraph 3 and the Barber decision are similar, a careful reading of them in the light of the contentions made in the prior case will demonstrate that they are not mutually exclusive. Barber contemplates statutory obligation while paragraph 3 contemplates contractual obligation.
Appellants' second argument concerning paragraph 3 focuses on the question of who has to pay the cost of additional appraisals if the parties are in dispute about the reappraised value of the land. Paragraph 3 says that in a dispute between the lessee and lessor, the lessee has to absorb the cost of the additional appraisals. Appellants cite Miss. Code Ann. § 29-3-82(f) (Supp. 1984) and § 29-3-1(2) (Supp. 1984) as authority that the cost of any reappraisals is to be paid from available sixteenth section school funds or other school funds of the district.
A reading of those statutes clearly indicates that the appraisals paid for out of sixteenth section school funds are the appraisals resulting from a dispute between a board of supervisors and a board of education in the initial leasing or re-leasing of the property. The statutes clearly do not provide for paid appraisals resulting from disputes between lessees and boards of education in the reappraisal of land during the pendency of a lease.
Appellants' third argument concerning paragraph 3 is that the language of paragraph 3 "is an attempt to divest appellants of their right to seek judicial review of any decision of the Board of Education and the appraisers." Appellants refer to section (a) of paragraph 3 which reads, "Any adjustments of annual ground rental determined by the above mentioned statutory appraisal procedure shall be binding upon the lessor and lessee."
Appellees contend that this language is "merely an attempt to put a stop to any repeated requests for new appraisals and is not an attempt to prevent the lessee from any statutory right of appeal."
In light of § 29-3-1, this Court does not believe paragraph 3 divests, or is an attempt to divest, appellants of their right to appeal the appraisers' decision to the chancery court if the appellants feel aggrieved. Section 29-3-1 states, in relevant part, "In the event any party is aggrieved by the decision of the appraisers setting forth the appraised rental value, the party so aggrieved shall be entitled to an appeal to the chancery court in which the land is located."

B.
Paragraph 6 of the lease provides in part:
(6) Upon expiration or termination of this lease or any extension thereof, all improvements then and on that date situated on the land shall become the property of Lessor, except that Lessee shall have 45 days after expiration or termination to remove any improvements. While this lease continues in force and effect, Lessee shall have the unrestricted right to remove, change, alter, modify, add to or subtract from any improvements on the land as the Lessee may in its sole discretion elect so to do, and the Lessor, while this lease or any extension thereof continues in force and effect, shall have no ownership interest in any such improvements.
If any improvements are removed, then Lessee shall be obligated to remove all foundations and paved areas, fill any excavations with a soil material suitable *780 as a foundation support for further construction and generally restore the premises to a condition suitable for construction, use and occupancy by others.
Appellants contend that if the land they are now leasing should be reclassified as forest land, rendering it unavailable for further leasing, Miss. Code Ann. § 29-3-43 (Supp. 1984) requires the Board of Education to either purchase improvements made by the lessee or allow the lessee to remove the improvements. Section 29-3-43 reads:
If any sixteenth section land is declared forest land at the end of a lease, the board of education shall make an appraisal and either pay a suitable amount to the lessee for the improvements or allow lessee to remove the same from the section land.
Appellants describe paragraph 6 as follows, "The proposed paragraph restricts petitioners to the right to remove improvements and denies their right to require the Board of Education to pay for the improvements that cannot be removed." (Emphasis added). Appellants apparently believe § 29-3-43 gives them a "right" to choose whether they will remove improvements or "require" the Board of Education to purchase them. To the contrary, Miss. Code Ann. § 29-3-43 grants the Board of Education the option to purchase the improvements or allow the improvements to be removed.
Paragraph 6 of the written contract follows § 29-3-43 and this Court holds that the Board was within its authority by including paragraph 6 in the written contract.

C.
Paragraphs 7, 8 and 9 of the lease provide:
(7) It is expressly agreed and understood and made a condition of this lease that this lease is made for residential and agricultural purposes only and in the event Lessee discontinues either to reside or to use the land for agricultural purposes, the Lessor shall have the right to declare Lessee in default of this lease, and shall have the right to enter and repossess the same and Lessee shall be liable for any unpaid rent or assessment to that time. Lessee shall however, should Lessee continue to reside on said property, have the right to retain up to five (5) acres and enter into a new residential lease at an annual rate based on appraised value at the time Lessor entered upon and repossessed said property.
(8) The parties herein expressly agree that if default shall be made in the payment of any tax, assessment or other charge made pursuant to this lease, then and in any such event of default it shall be lawful for the Lessor, its legal representatives or assigns, to enter upon said premises, or any part thereof either with or without process of law, to re-enter and repossess the same, and to distrain for any rent or assessment that may be due thereon, at the election of the Lessor, but nothing herein is to be construed to mean that the Lessor is not permitted to hold the said Lessee liable for any unpaid rent or assessment to that time. As to all other conditions, covenants and obligations imposed on the Lessee herein, enforcement shall be by proceedings at law or in equity against any person or persons violating or attempting to violate said conditions, covenants and obligations to restrain violation and to recover damages, if any, including reasonable expenses of litigation and a reasonable attorney's fee, which Lessee expressly agrees to pay. Such enforcement by proceedings at law or in equity may be instituted at any time after sixty (60) days written notice. Invalidation of any provision of this lease by judgment or court order shall in no way affect any of the provisions, which shall remain in full force and effect.
(9) In the event of any forfeiture of this lease and termination of the term thereof as aforesaid, said Lessee shall quit, deliver up and surrender possession of the aforesaid premises, and all structures *781 and improvements thereon to the said Lessor, and thereupon this lease and all agreements and covenants on the Lessor's behalf to be performed and kept, shall cease, terminate and be utterly void, the same as if the lease had not been made; and in addition thereto, the Lessor shall be entitled to whatever remedies it may have at law, for the collection of any unpaid rental hereunder, or for any other sums, for damages or otherwise that it may have sustained on account of the Lessee's nonfulfillment or nonperformance of the terms and conditions of this lease. Immediately upon the termination of this lease in any manner, whether by limitation or forfeiture, the Lessor shall be entitled to take possession of said premises and all the improvements thereon absolutely, any custom, usage or law to the contrary notwithstanding. Mobile homes, factory manufactured, complete with wheels, where permitted to be placed, may, however, be removed at the termination of the lease when terminated by the expiration of the full term, but not in the event of default.
Appellants contend that these paragraphs relating to default and termination are "in sharp contrast" to the provisions of Miss. Code Ann. § 29-3-57 (Supp. 1984) which reads in pertinent part:
It shall be the duty of the superintendent of education to collect promptly all rentals due and all principal and interest due upon loans and investments of sixteenth section funds. Upon a sixty (60) day default in payment of any rentals according to the terms of such lease, the lease shall be declared terminated unless the board of education finds extenuating circumstances were present, and the board shall inaugurate the proper legal proceedings to terminate such lease. (Emphasis added).
Further, appellants contend that paragraph 8 violates their right to due process under Article 3 of the Mississippi Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. More particularly, appellants take exception to the language allowing the lessor to enter the land upon default without due process of law.
Section 29-3-57 provides a procedure for the termination of the lease by the board of education after the rent payment has been in default for sixty days and this was incorporated into the lease. The requirement of "legal proceedings to terminate the lease" affords the due process of which the appellant complains. The legal proceeding necessitates notice and an opportunity to be heard. There is no merit to this contention.

D.
Paragraph 10 requires the lessee to "exercise due diligence in the protection of all improvements, timber and other property of lessor, which may be located on the leased premises or in the vicinity thereof... ." Appellants contend that "the only obligations that can be legally imposed upon [them] are those established by statutes or common law." Appellants cite no authority for this proposition, and this Court finds no merit to this contention. The Board of Education has the duty of imposing those provisions and obligations that a prudent lessor would require.

E.
Paragraph 11 requires the lessee to indemnify the lessor for claims against the lessor "arising from or in any manner connected with the exercise of any right granted or conferred" by the lease agreement. Appellants contend the indemnity clause is not statutorily authorized or permitted by common law.
Appellants again cite no authority for their contentions. This Court finds no reason to prevent appellants, as a matter of law, from voluntarily contracting to indemnify the lessor. This contractual provision is indicative that the Board was acting as a prudent lessor.
Regarding appellants' assignment of error that the Board of Education exceeded *782 its authority in requiring these lease provisions, the court holds that the Board was within its statutorily authorized duties as manager of trust property, empowered with duties of a general trustee, to manage the school lands through the exercise of the ordinary care and skill of a prudent person. The chancellor is affirmed in his finding that the conditions were not burdensome and were within the lawful authority of the Board.

VII.
Was the dollar amount of the rentals incorrectly determined?
Two appraisers made appraisals and recommendations as to the fair rental value. One appraiser recommended a fair rental value of $5.00, while the other appraiser recommended $5.50. The Board of Education, following the suggestion of the Superintendent of Education, averaged the two recommendations to arrive at a fair rental value of $5.25.
The appraisers based their recommendations on the examination and valuation of comparables. In examining those comparables and making his recommendation, the appraiser of the Turneys' leasehold property took into consideration location, road proximity, elevation, road frontage, and whether there were any ponds on the property. However, in every comparable the appraiser used, the landowner, and not the lessee, paid the property taxes on the land.
The Turneys make essentially two contentions under this assignment of error. First, they contend that the method used by the Board of Education in arriving at a fair rental value of $5.25 per acre was arbitrary and capricious and was not supported by substantial evidence.
This Court recognized in Barber v. Turney that the board of education has the final authority, duty, and responsibility to determine the reasonable annual rental amount to be assessed on sixteenth section lands. Commenting on the methodology used to arrive at the fair rental value this Court said:
It is very probable that there is no uniformity of appraisals or methods in arriving at fair market value and fair market rental value of sixteenth section lands in this state. We suspect the different counties use different approaches for determining the fair rental value.
Barber, 423 So.2d at 136.
In light of the fair rental value of the comparables, this Court holds that the Board made no mistake in arriving at a fair rental value of $5.25.
The Turney's second contention is that their monthly rent should be reduced to reflect their payment of the ad valorem taxes. According to the appellants' calculations, their rent should be reduced to $3.56 per acre. They arrive at this figure by subtracting $1.44 (yearly tax per acre) from $5.00 (the lower appraisal value).
The liability for payment of taxes is a matter of contract. The Board of Education, as a prudent manager of lease lands, is within its general powers to require that the lessee pay the general taxes in addition to the fair rental value of the land.
Taxation of sixteenth section land is governed by Miss. Code Ann. § 29-3-71 (1972) as follows:
Sixteenth section lands reserved for the use of schools, or lands reserved or granted in lieu of or as a substitute for the sixteenth sections, shall be liable, after the same shall have been leased, to be taxed as other lands are taxed during the continuance of the lease, but in case of sale thereof for taxes, only the title of the lessee or his heirs or assigns shall pass by the sale.
The school lands are not liable for general taxation as long as they remain unleased, but following their lease, the leasehold is liable for taxation. The lessee, not the county, is liable for general taxation. However, by virtue of Miss. Code Ann. § 29-3-73 (Supp. 1984), drainage taxes may be assessed against school lands. Those lands must then bear their pro rata share *783 of the special assessment. The drainage tax statute provides in part:
Where such sixteenth section land, or land taken in lieu thereof, shall be held by any lessee, whether his lease shall have heretofore been acquired or shall hereafter be acquired, all such drainage taxes and assessments accruing thereon during such lease shall, in the discretion of the board of education, either be paid by the lessee, his grantees or assigns, or by the board of education, but the liability for such drainage taxes shall be fixed by the lease contract when said lands are leased.
This Board of Education set the terms of its lease to include the lessee's liability for special assessment. Such requirement is a matter of contract between the parties and is a reasonable demand. The lessee contends, however, that the fair rental value should be reduced by the amount of the taxes on the leasehold. This Court does not agree because the two items are separate and distinct. The fair rental value of the land is computed and set; the lessee by contractual requirement of the Board of Education pays an additional amount for taxes. No credit for taxes should be given against the rent.
The chancellor was correct in his holding that a fair rental value was determined and that the contract specified the payment of taxes in addition thereto.
This Court finds no error in the trial court's ruling. Therefore, this appeal is affirmed.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, ROBERTSON and ANDERSON, JJ., concur.
SULLIVAN, J., not participating.

APPENDIX
The following is a brief history of Sixteenth Section land as discussed in Papasan v. United States, 756 F.2d 1087 (5th Cir.1985).
In its western expansion, the United States encouraged public education by granting school lands to newly-admitted states.[1a] The Land Ordinance of 1785, which provided for the survey and sale of the Northwest Territory,[2] thus "reserved the lot No. 16, of every township, for the maintenance of public schools within the said township ..." 1 Laws of the United States 565 (1815).[3] Though title to Sixteenth Section land vested in the state upon approval of the federal survey, the state had a "binding and perpetual obligation to use the granted lands for the support of public education." Andrus v. Utah, 446 U.S. 500, 523, 100 S.Ct. 1803, 1815, 64 L.Ed.2d 458 (1980) (Powell, J., dissenting). All proceeds from the sale or lease of such land were thus "impressed with a trust in favor of the public schools." Id. at 523-24, 100 S.Ct. at 1815. Hence the term, "school lands trust."
A similar history attends the land south of the Ohio River. Under its charter from England, Georgia held claim to most of what now comprises the states of Georgia, Alabama and Mississippi. In *784 1802, Georgia ceded these territories to the United States, on the condition that they would eventually attain statehood with the same privileges and rights granted the inhabitants of the Northwest Territory under the Northwest Ordinance of 1789.[4] In 1803, Congress provided for the survey and disposition of all lands south of the state of Tennessee to which Indian title had been extinguished. 2 Stat. 229 (1803). As with the Northwest Territory, Sixteenth Sections were reserved, 2 Stat. 229, Ch. 27, § 12 at 234 (1803), and their lease authorized, 3 Stat. 163 (1815), for the support of the public schools within each township.[5] In 1817, Congress authorized the formation of the State of Mississippi, 3 Stat. 348 (1817), the survey of its lands, and the reservation of Sixteenth Sections. 3 Stat. 375 (1817). "Title" to certain land in Northern Mississippi, however, remained in the Chickasaw Indian Nation.[6] These Indian claims were not extinguished until 1832, when, pursuant to the Treaty of Pontotoc Creek, the Chickasaw Indians ceded all of their lands east of the Mississippi River to the United States. 7 Stat. 381 (1832).[7] Under this Treaty, all of the Chickasaw Cession lands were to be surveyed by the United States, and sold to private parties, with the proceeds to the Chickasaw Nation. Unlike other government land sales, however, no Sixteenth Section land was reserved from the sale of the Chickasaw lands. See City of Corinth v. Robertson, 125 Miss. 31, 87 So. 464 (1921).[8] This case has its genesis in that circumstance.
To remedy this deficiency, Congress, in 1836, authorized the selection of other unsold public land in the Chickasaw Cession, equal to and in lieu of the unreserved Sixteenth Sections. Once selected, these lands were to "vest in the State of Mississippi for the use of schools within said territory in said State." 5 Stat. 116, § 2 (1836).[9] After the Mississippi Legislature accepted the Chickasaw Cession Lieu Lands,[10] 1844 Miss. Laws Ch. LXVII at 238, it authorized their ninety-nine-year lease, "renewable forever," at a price not less than six dollars per acre, with the proceeds therefrom "to be held in trust by said statefor the use of schools in the Chickasaw Cession." 1848 Miss. Laws Ch. III at 62. In 1852, apparently to clarify Mississippi's authority to lease or sell its lieu land, see Jones v. Madison County, 72 Miss. 777, 794-95, 18 So. 87 (1895), Congress ratified all past leases and authorized the State to *785 sell the lands for the support of the Chickasaw Cession schools. 10 Stat. 6 (1852). The Mississippi Legislature then authorized the fee sale of the Chickasaw Cession Lieu Lands and directed that the sales proceeds be invested in eight percent loans to the State's railroads. 1856 Miss. Laws Ch. LVI. Most of the investment was lost when the railroads were destroyed in the Civil War.
Since then, the Mississippi Legislature has appropriated monies to replace the interest lost on its failed investment, see 1878 Miss. Laws, Ch. IX at 86, first at eight and later at six percent. See Miss. Const. Art. VIII, § 212 (1890). These funds are paid each year to the Chickasaw Cession counties for the support of their public schools in lieu of the returns on the unreserved Sixteenth Section lands or the ill-disposed Lieu Lands.
NOTES
[1] The school board was apparently relying on Attorney General Opinions 78-38 and 79-39.
[1a] See Andrus v. Utah, 446 U.S. 500, 522-28, 100 S.Ct. 1803, 1814-17, 64 L.Ed.2d 458 (1980) (Powell, J., dissenting) for a historical overview of school land grants in this country.
[2] The Northwest Territory included all of the land west of the original thirteen states, north of the Ohio River, east of the Mississippi River and south of Canada. Public Land Law Review Commission, History of Public Land Law Development, Ch. 1-3 (1968).
[3] The Northwest Territory and all territory acquired thereafter was divided by survey into townships of thirty-six numbered sections, each one square mile in area. "Sixteenth Section" land thus refers to section number sixteen, reserved in each township for public schools. The Northwest Ordinance of 1789, which provided for the government of the Northwest Territory, 1 Stat. 50, echoed the policy behind this reservation, declaring: "Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." 1 Stat. 52.
[4] See Articles of Cession and Agreement, April 24, 1802, V Territorial Papers of the United States, 142 (1802); 1802 Laws of Georgia, No. 35, art. 1, 5th Condition.

Earlier, in 1789, Congress established the Mississippi Territory, comprising what is now the southern two-thirds of Mississippi and Alabama, and provided that it be governed by the provisions of the Northwest Ordinance of 1789. 1 Stat. 549, 550, § 6 (1798). The Mississippi Territory was extended in 1804. 2 Stat. 303, § 7 (1804).
[5] Because some of this Sixteenth Section land was subject to the prior claims of settlers and grantees, Congress authorized the Secretary of the Treasury to select substitute school lands in lieu of unavailable reserved sections. 2 Stat. 400, 401, § 6 (1806).
[6] Apparently there was dispute in the court below as to whether any of the pre-1832 Acts of Congress reserving Sixteenth Section land for public schools applied to the Chickasaw Indian land. We need not face these issues here.
[7] The Chickasaw Cession territory encompassed the twenty-three North Mississippi counties in which the plaintiffs reside. These counties include: Alcorn, Benton, Calhoun, Chickasaw, Clay, Coahoma, DeSoto, Itawamba, Lafayette, Lee, Marshall, Monroe, Panola, Pontotoc, Prentiss, Quitman, Tate, Tippah, Tishomingo, Tunica, Union, Webster and Yalobusha Counties. Of these, Coahoma, Quitman, Webster and Yalobusha are only partly within the Cession.
[8] All of the Chickasaw lands were sold despite the fact that the Treaty provided that the land would be surveyed and sold "in the same manner and on the same terms as other public lands...." Art. II, Treaty of Pontotoc Creek.
[9] Though Congress originally authorized the Secretary of the Treasury to select lieu lands, it later allowed Mississippi's Governor to direct the selection. 5 Stat. 490 (1842).
[10] The Chickasaw Cession Lieu Lands comprised some 174,555 acres located in the counties of Bolivar, Coahoma, Tallahatchie, Quitman, Panola and Leake.