REVISED, June 9, 1998

UNITED STATES COURT OF APPEALS
For the Fifth Circuit

No. 97-30159

KENNETH DON EARLES;
ALBERT R. LEGER; JOSEPH MICHAEL SLEDGE,

Plaintiffs-Appellees,

VERSUS

STATE BOARD OF CERTIFIED PUBLIC ACCOUNTANTS OF LOUISIANA;
MILDRED W. MCGAHA, CPA; L. PAUL HOOD, CPA; LEON K. POCHE, CPA;
LAWRENCE W. STOULIG, JR., CPA; DONALD L. MOORE, CPA;
W. THERON ROBERTS, CPA; MICHAEL A. THAM, CPA;
SUSAN C. COCHRAN, CPA; J. GORDON REISCHE,

Defendants-Appellants.

Appeal from the United States District Court
For the Eastern District of Louisiana

April 24, 1998

Before GARWOOD, DUHÉ, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Rules promulgated by the State Board of Certified Public Accountants of Louisiana prohibit CPAs from accepting commissions and engaging in the practice of so-called "incompatible professions." These rules apply to Louisiana's CPAs and have been used to prevent the three plaintiffs in this lawsuit from carrying out their accounting practices while simultaneously selling

securities.  The plaintiffs sued the Board and its individual members, seeking to block the enforcement of these rules.

The defendants filed a motion to dismiss the lawsuit, claiming immunity from suit (1) under the Eleventh Amendment and (2) under the state-action exemption doctrine of federal antitrust laws.  The motion was denied, and the defendants now seek interlocutory review.  The Board is entitled to Eleventh Amendment immunity; however, the federal claims against the Board's individual members may proceed under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908).  Finally, the state-action doctrine does block scrutiny of the Board's rules under federal antitrust laws.  Accordingly, we affirm in part, reverse in part, and remand the matter with instructions for further proceedings in the district court.

## I.    Factual and Procedural Background
### A.    *The Plaintiffs*

Kenneth Don Earles, a CPA, has practiced as an accountant in Crowley, Louisiana since 1969.  Beginning in 1987, he obtained the licenses necessary to become a securities broker and began practicing as a broker-dealer licensed with H.D. Vest Investment Securities, Inc.  Mr. Earles earns commissions from his sales of securities.  His securities business is kept separate from his accounting business, with separate books, records, and bank accounts.

In October 1988, the Board of Certified Public Accountants of Louisiana notified Mr. Earles that it considered his practice of

concurrently acting as a CPA and a securities broker to be a violation of the Board's rules pertaining to "incompatible occupations"[1] and "receipt of commissions."[2]  A series of communications ensued between the Board and Mr. Earles, culminating in a March 1990 administrative hearing on the Board's complaint.

In August 1990, the Board issued its decision finding Mr. Earles in violation of the rule proscribing the practice of incompatible occupations.  Mr. Earles's future certification and licensure as a CPA were expressly conditioned upon cessation of his securities business.  Mr. Earles responded by filing this lawsuit against the Board and its individual members in federal court.  He

---

[1]  The incompatible occupations rule provides:

> A licensee shall not concurrently engage in the practice of public accountancy and in any other business or occupation which impairs his independence or objectivity in rendering professional services, or which is conducted so as to augment or benefit the accounting practice, unless these rules are observed in the conduct thereof.

LA. ADMIN. CODE tit. 46, § XIX.501(E) (Sept. 1997) <www.state.la.us/osr/lac/lac.htm>.

[2]  The rule against receiving commissions provides:

> A licensee shall not pay a commission to obtain a client or accept a commission for a referral to a client of products or services of others.  This rule does not prohibit payments for the purchase of all, or a part, of an accounting practice, or retirement payments to persons formerly engaged in the practice of public accountancy, or payments to the heirs or estates of such persons.

LA. ADMIN. CODE tit. 46, § XIX.501(C) (Sept. 1997) <www.state.la.us/osr/lac/lac.htm>.

also sought judicial review of the Board's decision in state court.

The federal suit was stayed pending state-court review.[3]  In state court, the Board's ruling was initially overturned but later reinstated on appeal.  *See Earles v. State Bd. of Certified Pub. Accountants*, 665 So. 2d 1288 (La. Ct. App. 1995), *writ denied*, 669 So. 2d 397 (La. 1996).

In August 1996, after Mr. Earles had exhausted his remedies in state court, the federal suit was reactivated.  Soon thereafter, two additional plaintiffs joined the suit -- Albert R. Leger, who had practiced as a CPA in Marksville, Louisiana since 1975, and Joseph Michael Sledge, who had practiced as a CPA in Shreveport, Louisiana since 1975.  Like Mr. Earles, both Mr. Leger and Mr. Sledge are licensed securities brokers affiliated with H.D. Vest. Each also keeps his securities-related business separate from his accounting practice.  In January 1997, Mr. Leger and Mr. Sledge were found by the Board to be guilty of violating the rules against practicing incompatible professions and receiving commissions. They were each fined, and their accounting licenses were revoked.

## B.    *The Defendants*

The defendants in this lawsuit are the Board of Certified Public Accountants of Louisiana and its individual members in their official capacities.  The Board was created by the State of

---

[3]    *See Earles v. State Bd. of Certified Pub. Accountants*, 1992 WL 10329 (E.D. La. Jan. 16, 1992) (abstaining from further proceedings pursuant to the doctrine of *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496 (1941)).

Louisiana for the purpose of licensing public accountants and regulating the profession of public accounting within the state. *See* LA. REV. STAT. ANN. §§ 37:73, 37:75 (West 1988 & Supp. 1998). The Board's seven members are chosen by the governor from a slate of candidates proposed by the Society of Louisiana Certified Public Accountants, and they must be confirmed by the state senate. *See id.* § 37:73 (West 1988).

Among the powers of the Board is the ability to "[a]dopt and enforce all rules and regulations, bylaws, and rules of professional conduct as the board may deem necessary and proper to regulate the practice of public accounting in the state of Louisiana." *Id.* § 37:75(B)(2). Pursuant to this power, the Board adopted the incompatible-occupations and receipt-of-commissions rules which gave rise to this lawsuit.[4]

## II. Appellate Jurisdiction

Pursuant to our precedent applying 28 U.S.C. § 1291 and the collateral order doctrine,[5] we have appellate jurisdiction to consider an interlocutory appeal from the denial of a motion to

---

[4] The purported justification for these rules is the preservation of the independence of CPAs. The Supreme Court has acknowledged that a state's interest in "maintaining CPA independence and ensuring against conflicts of interest" is a substantial one. **Edenfield v. Fane**, 507 U.S. 761, 770 (1993).

[5] *See* **Coopers & Lybrand v. Livesay**, 437 U.S. 463, 468 (1978) ("To come within the 'small class' of decisions excepted from the final-judgment rule by **Cohen** [**v. Beneficial Indus. Loan Corp.**, 337 U.S. 541 (1949)], the order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment.").

dismiss based upon immunities bestowed by the Eleventh Amendment and the state-action antitrust exemption. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993) (denial of Eleventh Amendment immunity is subject to interlocutory review); *Martin v. Memorial Hosp.*, 86 F.3d 1391 (5th Cir. 1996) (denial of the state-action exemption is subject to interlocutory review).[6]

### III. Eleventh Amendment Immunity

The United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment thus negates federal jurisdiction over covered suits, including federal suits against a state brought by the citizens of that state. *See Hans v. Louisiana*, 134 U.S. 1 (1890).

Of course, the Board and its members are not the state itself. The scope of the Eleventh Amendment, however, is not limited to suits that name a state as a defendant. *See, e.g.*, *Regents of the Univ. of Cal. v. Doe*, 117 S. Ct. 900, 903 (1997). The Eleventh

---

[6] At oral argument, the plaintiffs conceded that *Martin* controls the question of appellate jurisdiction over the state-action element of this case. They urged our panel to overrule *Martin*, but this is not an option available to us. It has been well established in this circuit that one panel may not ignore the holding of a previous panel absent intervening authority from the Supreme Court, an en banc decision of our Court, or Congress. *See, e.g.*, *Okoro v. INS*, 125 F.3d 920, 925 (5th Cir. 1997).

Amendment bars any suit in which a state is the "real, substantial party in interest." ***Pennhurst State Sch. & Hosp. v. Halderman***, 465 U.S. 89, 101 (1984); *see also* ***Ford Motor Co. v. Department of Treasury***, 323 U.S. 459, 464 (1945).  We must thus decide whether the Board and its members satisfy this standard and thereby avoid suit.

**A.  *The Board***

The Board claims that because it is a "state agency," LA. STAT. REV. ANN. § 37:73(A) (West Supp. 1998), it is entitled to Eleventh Amendment immunity.  Federal law controls the Board's eligibility for Eleventh Amendment immunity.  *See* ***Doe***, 117 S. Ct. at 904 n.5. State agencies are immunized by the Eleventh Amendment in certain circumstances.  *See, e.g.*, ***Pennhurst***, 465 U.S. at 100; ***Papasan v. United States***, 756 F.2d 1087, 1092 (5th Cir. 1985), *aff'd in part, vacated in part sub nom.* ***Papasan v. Allain***, 478 U.S. 265 (1986). Simply being a political subdivision of a state, however, is not enough.  *See* ***Edelman v. Jordan***, 415 U.S. 651, 667 n.12 (1974).  We must look to see whether the entity "in effect, stands in the shoes of the state itself." ***Hander v. San Jacinto Junior College***, 519 F.2d 273, 278 (5th Cir.), *modified on other grounds*, 522 F.2d 204 (5th Cir. 1975); *see also* ***Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle***, 429 U.S. 274, 280 (1977) (entity must be an "arm of the state"); ***Voisin's Oyster House, Inc. v. Guidry***, 799 F.2d 183, 186 (5th Cir. 1986) (entity must be an "alter ego" of the state).  Our analysis must consider the particular nature of the entity,

7

including its powers and duties, the nuances of its organizational structure, and its interrelationship with other organs of the state. *See, e.g.*, *Mt. Healthy*, 429 U.S. at 280; *Jacintoport Corp. v. Greater Baton Rouge Port Comm'n*, 762 F.2d 435, 438 (5th Cir. 1985), *cert. denied*, 474 U.S. 1057 (1986); *Laje v. R.E. Thomason Gen. Hosp.*, 665 F.2d 724 (5th Cir. 1982); *United Carolina Bank v. Board of Regents of Stephen F. Austin State Univ.*, 665 F.2d 553, 557 (5th Cir. Unit A 1982).

There is no simple litmus test that determines whether a state agency is an "arm of the state" for the purposes of Eleventh Amendment immunity. Rather, the matter is determined by reasoned judgment about whether the lawsuit is one which, despite the presence of a state agency as the nominal defendant, is effectively against the sovereign state. In determining whether a given state agency operates as an "arm of the state," our Court has taken many factors into account, including: (1) whether the state, through statutes or case law, views the entity as an arm of the state; (2) the source of the entity's funding; (3) whether the entity is concerned with local or statewide problems; (4) the entity's degree of authority independent from the state; (5) whether the entity can sue and be sued in its own name; and (6) whether the entity has the right to hold and use property. *See, e.g.*, *Voisin's Oyster House*, 799 F.2d at 186-87; *Clark v. Tarrant County*, 798 F.2d 736, 744-45 (5th Cir. 1986); *Jacintoport*, 762 F.2d at 438-40; *United Carolina Bank*, 665 F.2d at 557-58; *Huber, Hunt & Nichols, Inc. v.*

8

*Architectural Stone Co.*, 625 F.2d 22, 24-25 (5th Cir. 1980). Considering these factors, we conclude that a suit against the Board is, in effect, a suit against the State of Louisiana.

1.    *The state's view.* -- First, we consider the Board's place in the overall scheme of Louisiana government.  The Board is "a state agency within the Department of Economic Development."  LA. STAT. REV. ANN. § 37:73(A) (West Supp. 1998).  The Department of Economic Development is a department of the executive branch of the government of Louisiana.  *See* *id.* §§ 36:3, 36:4 (West 1985 & Supp. 1998).  In this situation, it appears that Louisiana would regard the Board as part of the state.  We are compelled to draw this conclusion by our disposition in *Voisin's Oyster House, Inc. v. Guidry*, 799 F.2d 183 (5th Cir. 1986).  There, as here, the entity in question was a subdivision of a department of the executive branch.  Our Court reasoned:

> According to Louisiana statutes, the Department is a part of the executive branch of the state government, LA. REV. STAT. ANN. § 36:4 (West 1985), and the Commission is part of the Department.  LA. REV. STAT. ANN. § 36:610 (West 1985).  In its statutes, Louisiana treats all executive departments the same, LA. REV. STAT. ANN. § 36:4(A), and provides that "[n]o suit against the state or a state agency or political subdivision shall be instituted in any court other than a Louisiana state court."  LA. REV. STAT. ANN. § 13:5106(A) (West Supp. 1986). *See* *Fireman's Fund Insurance Co. v. Department of Transportation and Development*, 792 F.2d 1373 (5th Cir.1986) (holding that a similar executive department had Eleventh Amendment immunity and implying that all Louisiana executive departments have such immunity).  The Louisiana Supreme Court has held "[i]f the office is created by the legislature, or is established in the first instance by the constitution, it is a

9

> state office." ***Mullins v. Louisiana***, 387 So. 2d 1151, 1152 (La. 1980). The Department was created by the state legislature, LA. REV. STAT. ANN. § 36:601, and, therefore, the Louisiana courts would view the Department as part of the state.

***Voisin's Oyster House***, 799 F.2d at 186 (alterations in original). The circumstances encountered in ***Voisin's Oyster House*** pertaining to that entity's place in Louisiana government are substantially identical to the present case, and we therefore conclude that this factor weighs in favor of Eleventh Amendment immunity.

　　　**2.** ***Source of the entity's funding.*** -- Next, we consider the source of the Board's funding. In this case, the Board is financially independent from the state. The Board is funded solely by fees collected from accountants. *See* LA. REV. STAT. ANN. §§ 37:80, 37:82 (West 1988 & Supp. 1998); LA. ADMIN. CODE tit. 46, §§ XIX.1911, .2101, .2501 (Sept. 1997) <www.state.la.us/osr/lac/lac.htm>. Moreover, statutes and regulations prohibit the Board from resorting to state coffers for funding. *See* LA. REV. STAT. ANN. § 37:76 (West 1988) ("No expenses incurred by the board shall ever be charged to or against the funds of the state of Louisiana."); ***id.*** § 37:75(B)(8) ("The Board may . . . [e]mploy legal counsel to carry out the provisions of this Chapter, provided that the fees of such counsel and the costs of all proceedings, except criminal prosecutions, are paid by the board from its own funds . . . ."); LA. ADMIN. CODE tit. 46, § XIX.903 (Sept. 1997) <www.state.la.us/osr/lac/lac.htm> ("The compensation of board members and all other necessary expense

10

incurred by the board . . . shall be paid out of the treasury of the board."). Thus, the Board is financially independent, and there is no threat that Louisiana will pay money damages to a citizen pursuant to a judgment obtained in federal court. Our examination of this factor weighs against a finding of Eleventh Amendment immunity for the Board.

3. ***Scope of the entity's responsibilities.*** -- The Board is concerned with regulating the practice of public accounting on a statewide, rather than local, scale. *See* LA. REV. STAT. ANN. § 37:75 (West 1988 & Supp. 1998). This factor favors Eleventh Amendment immunity for the Board.

4. ***Independence from the state.*** -- The Board exercises considerable authority independent from the state. The Board has the power to "[a]dopt and enforce all rules and regulations, bylaws, and rules of professional conduct as the board may deem necessary and proper to regulate the practice of public accounting in Louisiana, to provide for the efficient operation of the board, and to otherwise discharge its duties and powers." LA. REV. STAT. ANN. § 37:75(B)(2) (West 1988). The legislature may review proposed rule changes. *See* ***id.*** § 49:968 (West 1987 & Supp. 1998). In the usual case (such as the adoption of the rules at the heart of this lawsuit), however, the Board's proposed rule changes simply take effect without any legislative consideration or action whatsoever. *See* ***id.*** § 49:968(H)(1) (if the legislature fails to

11

act on proposed rule changes, the rule may be adopted ninety days after notice is published in the State Register).  This factor cuts against Eleventh Amendment immunity.

5.      *Capacity to sue and be sued.* -- The Board has a limited capacity to sue and be sued.  *See, e.g.*, LA. REV. STAT. ANN. §§ 49:963-:965 (West 1987 & Supp. 1998) (authorizing judicial review of Board actions).  The Board's power to sue and be sued is not established as plainly as for other similarly situated state agencies in Louisiana.  *See, e.g.*, **id.** § 37:1393(A) (West Supp. 1998) (State Licensing Board for Locksmiths "may sue and be sued"); **id.** § 37:3273(A) (West 1988) (Louisiana State Board of Private Security Examiners "may sue and be sued").  The Board does, however, have some power to "sue and be sued" insofar as it has the power to litigate as an independent party.  *See, e.g.*, **State Bd. of Certified Pub. Accountants v. Donnelly**, 688 So. 2d 127 (La. Ct. App.), *writ denied*, 694 So. 2d 247 (La. 1997).  Ultimately, this is not a case in which the state has granted "express authority to 'sue and be sued, plead and be impleaded'" in the entity's own name, **Huber, Hunt & Nichols**, 625 F.2d at 25 (quoting **Hopkins v. Clemson Agric. College**, 221 U.S. 636, 658 (1911)), so this factor lends slight guidance to our Eleventh Amendment immunity inquiry.

6.      *Right to hold and use property.* -- The parties have presented conflicting views as to whether the Board has the right to hold and use property.  There is no express statutory grant of

12

such power to the board.  But on the other hand, the powers that are granted to the Board are so broad that they arguably encompass the right to hold and use property.  *See, e.g.*, LA. REV. STAT. ANN. § 37:75(B)(9) (West 1988) ("The board may . . . [i]ncur all necessary and proper expenses . . . .").  Because of this statutory ambiguity, this factor again has little effect on our analysis.

In sum, when we evaluate the mixed indications given by the various factors discussed above, we are led to the conclusion that the Board is entitled to immunity.  The question is a close one, but ultimately we are persuaded by the legislature's broad grant of power to a state agency (composed of members who are appointed by serve at the pleasure of the governor) charged with carrying out the governmental function of regulating the practice of public accounting on a statewide basis.  We therefore conclude that the Board is entitled to Eleventh Amendment immunity.


**B.**   *Individual Members of the Board*

Though the Board itself is eligible for Eleventh Amendment immunity, it does not follow that the members of the Board may claim immunity for their official actions.  The doctrine of ***Ex parte Young***, 209 U.S. 123 (1908), precludes the individual Board members' claims of Eleventh Amendment immunity.

The rule of ***Ex parte Young*** has been traditionally viewed as establishing that a "federal court is not barred by the Eleventh Amendment from enjoining state officers from acting unconstitutionally, either because their action is alleged to

violate the Constitution directly or because it is contrary to a federal statute or regulation that is the supreme law of the land." 17 CHARLES ALAN WRIGHT, ET. AL, FEDERAL PRACTICE AND PROCEDURE, § 4232 (2d ed. 1988). Since the filing of the briefs in this case, the Supreme Court has handed down its decision in *Idaho v. Coeur d'Alene Tribe*, 117 S. Ct. 2028 (1997). That decision, despite its disclaimer of intent to "question the continuing validity of the *Ex parte Young* doctrine," *Coeur d'Alene*, 117 S. Ct. at 2034, casts some doubt upon previous conventional wisdom in this area.

The Fifth Circuit has not yet had the opportunity to consider the effect of *Coeur d'Alene*, though several other circuits have. *See Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997); *Marie O. v. Edgar*, 131 F.3d 610, 616 n.10, 617 n.13 (7th Cir. 1997); *Strahan v. Coxe*, 127 F.3d 155, 166-67 (1st Cir. 1997), *petition for cert. filed*, 66 U.S.L.W. 3605 (U.S. Mar 6, 1998) (No. 97-1485); *Sofamor Danek Group, Inc. v. Brown*, 124 F.3d 1179, 1183-85 (9th Cir. 1997); *Mille Lacs Band of Chippewa Indians v. State of Minn.*, 124 F.3d 904, 913-14 (8th Cir. 1997), *petition for cert. filed*, 66 U.S.L.W. 3559 (U.S. Feb. 17, 1998) (No. 97-1337). We concur with the consensus among other courts that although the principal opinion in *Coeur d'Alene* suggests a case-by-case (rather than rule-based) approach to the application of *Ex parte Young*, *see Coeur d'Alene,* 117 S. Ct. at 2038-40 (opinion of Kennedy, J.), this part of the opinion did not muster a majority, and a majority of the Court would continue to apply the rule of *Ex parte Young* as it has been traditionally understood, *see id* at 2047

14

(O'Connor, J., concurring in part and concurring in the judgment (joined by Scalia and Thomas, JJ.)); *id.* at 2048 (Souter, J., dissenting (joined by Stevens, Ginsburg, and Breyer, JJ.)).

The rule of *Ex parte Young* empowers the federal courts to grant the prospective injunctive relief sought by the plaintiffs if the rules challenged in this case do indeed violate federal law. The plaintiffs' state-law claims, however, are not cognizable in a proceeding under *Ex parte Young* because state officials continue to be immunized from suit in federal court on alleged violations of state law brought under the federal courts' supplemental jurisdiction. *See* **Pennhurst**, 465 U.S. at 103-21; *see also* **Papasan v. Allain**, 478 U.S. 265, 277 (1986); **Oneida County v. Oneida Indian Nation**, 470 U.S. 226, 251 (1985); **Hays County Guardian v. Supple**, 969 F.2d 111, 125 (5th Cir. 1992), *cert. denied*, 506 U.S. 1087 (1993). The **Ex parte Young** doctrine promotes federal sovereignty, but is limited by the constitutional immunity granted to the states by the Eleventh Amendment. *See* **Pennhurst**, 465 U.S. at 105-06. It therefore does not serve to subject state officials to suit in federal court over alleged violations of state law, as that result does not advance the concerns of **Ex parte Young** and also "conflicts directly with the principles of federalism that underlie the Eleventh Amendment." **Id.** at 106. The availability of the supplemental jurisdiction statute does not change this result because that rule arises merely from "a judge-made doctrine of expediency and efficiency derived from the general Art. III language conferring power to hear all 'cases' arising under federal

15

law or between diverse parties." *Id.* at 120 (citing ***United Mine Workers v. Gibbs***, 383 U.S. 715, 725 (1966)).

Thus, the plaintiffs' suit may proceed against the individual members of the Board under the doctrine of ***Ex parte Young***, but the limitations of the doctrine require that the plaintiffs' state-law claims be dismissed upon remand.

## IV.  State Action Exemption

We now turn to the defendants' state-action defense.  The state-action exemption from federal antitrust liability was first recognized in the case of ***Parker v. Brown***, 317 U.S. 341 (1943). State action is properly treated as an immunity from suit,[7] and therefore our review of the district court's pretrial rejection of a state-action exemption is appropriate.[8]  We begin, as do all of

---

[7] *See* ***Martin***, 86 F.3d at 1395-96; 3 JULIAN O. VON KALINOWSKI ET AL., ANTITRUST LAWS AND TRADE REGULATION § 47.01[2] (1997).

[8] *See, e.g.*, ***Hoover v. Ronwin***, 466 U.S. 558, 565-67 (1984) (reversing the lower court's determination that state-action immunity should not be decided on a Rule 12(b)(6) motion to dismiss).

the Supreme Court's opinions on state action,[9] with a look back to *Parker*'s first principles.

In *Parker*, the Court considered the legal effect of the California Agricultural Prorate Act. The California statute permitted regulations -- or as they were called, a "marketing program" -- designed to protect the raisin industry. One effect of this program was that the freedom of raisin producers to sell their crops in interstate commerce was seriously restricted. *See Parker*, 317 U.S. at 344-49. The program was challenged under the Sherman Act. The Supreme Court decided that Congress, in enacting federal antitrust legislation, had not intended to preempt economic regulation by the states. The central holding of *Parker* was that the Sherman Act does not "restrain a state or its officers or agents from activities directed by its legislature." *Id.* at 350-51. The Court expressly rested its analysis on federalism principles:

> In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify

---

[9] *See FTC v. Ticor Title Ins.*, 504 U.S. 621, 632-33 (1992); *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 370 (1991); *Patrick v. Burget*, 486 U.S. 94, 99 (1988); *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 344 (1987); *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 55-57 (1985); *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 38 (1985); *Hoover*, 466 U.S. at 567-68; *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 48-49 (1982); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 103-04 (1980); *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. at 389, 408-09 (1978); *Bates v. State Bar*, 433 U.S. 350, 359 (1977); *Cantor v. Detroit Edison Co.*, 428 U.S. at 579, 585-91 (1976); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788 (1975).

17

> a state's control over its officers and agents is not lightly to be attributed to Congress.

*Id.* at 551.

The *Parker* state-action doctrine has been construed to exempt both state agencies and private individuals from liability for activities that might otherwise violate federal antitrust law. *See, e.g.*, *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56-57 (1985). When the *Parker* exemption is invoked by a defendant other than the state, however, the allegedly anticompetitive activity is subjected to greater scrutiny before state-action immunity will be granted. *See Hoover v. Ronwin*, 466 U.S. 558, 569 (1984). In most cases, two criteria must generally be satisfied: (1) the alleged anticompetitive conduct must have been taken pursuant to a clearly articulated and affirmatively expressed state policy to displace competition with state regulation; and, (2) the state must actively supervise the implementation of its policy. *See California Retail Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97 (1980); *DFW Metro Line Servs. v. Southwestern Bell Tel., Corp.*, 988 F.2d 601, 605 (5th Cir.), *cert. denied*, 510 U.S. 864 (1993); PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 212.1a (Supp. 1997). This two-pronged review is commonly known as the *Midcal* test.

Some defendants are not subject to both prongs of *Midcal* review. In *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985), the Supreme Court exempted municipalities from the active-supervision prong of the *Midcal* test. *See Town of Hallie*, 471 U.S.

18

at 46-47. The Court distinguished municipalities from other defendants subjected to the *Midcal* test:

> Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State. Where the actor is a municipality, there is little or no danger that it is involved in a private price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

*Id.* at 47. Fortunately for the defendants,[10] the Board is functionally similar to a municipality and is also exempted from the active-supervision prong. Despite the fact that the Board is composed entirely of CPAs who compete in the profession they regulate, the public nature of the Board's actions means that there is little danger of a cozy arrangement to restrict competition. So long as the Board is acting within its authority and pursuant to a clearly established state policy, there is no need for active supervision of the exercise of properly delegated authority. This

---

[10] Exemption from the "active supervision" requirement is fortunate from the Board's perspective because its rulemaking process was not actively supervised. Despite the legislature's reservation of power to review the Board's proposals for new rules, rule changes can take effect without any active oversight by the legislature. LA. REV. STAT. ANN. § 49:968 (West 1987 & Supp. 1998). That is in fact what happened regarding the rules challenged in this case, and the situation is indistinguishable from the "negative option system" which was determined by the Supreme Court not to constitute active state supervision. *See Ticor*, 504 U.S. at 629, 638-40.

19

conclusion comports with our prior precedent and that of other courts of appeals. *See **Benton, Benton & Benton v. Louisiana Pub. Facilities Auth.***, 897 F.2d 198, 203 (5th Cir. 1990) (determining the defendant to be a state agency and "as such" not subject to the active state supervision prong of **Midcal**), *cert. denied*, 499 U.S. 975 (1991); *see also **Porter Testing Lab. v. Board of Regents for Okla. Agric. & Mechanical Colleges***, 993 F.2d 768, 772 (10th Cir.) (where the antitrust defendants included "a constitutionally created state board, its executive secretary, and a state created and funded university . . . a showing of active supervision is unnecessary to qualify for state action antitrust immunity"), *cert. denied*, 510 U.S. 932 (1993); **Cine 42nd Street Theater Corp. v. Nederlander Org., Inc.**, 790 F.2d 1032, 1047 (2d Cir. 1986) (where the defendant was a statutorily created political subdivision of the state, defendant's "interests must be defined as public rather than private, and consequently, the active state supervision requirement is unnecessary"); *see also* AREEDA & HOVENKAMP, *supra*, ¶ 212.7a ("Dispensing with any supervision requirement for municipalities implies, a fortiori, the same for departments and agencies of the state itself."). Moreover, this development was expressly anticipated by the Supreme Court's **Town of Hallie** decision. *See **Town of Hallie***, 471 U.S. at 46 n.10 ("In cases in which the actor is a state agency, it is likely that active state supervision would also not be required, although we do not here decide that issue.").

The individual Board members take advantage of the Board's privileged status for the purposes of the *Midcal* test. The individuals' actions in adopting and enforcing the rules involved in this case were performed in their official capacities as members of the Board. They were, in effect, agents of the Board for the purposes of state-action immunity. *See* *Crosby v. Hospital Auth.*, 93 F.3d 1515, 1529-30 (11th Cir. 1996), *cert. denied*, 117 S. Ct. 1246 (1997).

Thus, in order to take advantage of the state-action exemption, the defendants must simply demonstrate that they acted "pursuant to state policy to displace competition with regulation or monopoly public service" that was "clearly articulated and affirmatively expressed." *Community Communications Co., Inc. v. City of Boulder*, 455 U.S. 40, 51 (1982). The Supreme Court has further elaborated on this requirement, noting: "We have rejected the contention that this requirement can be met only if the delegating statute explicitly permits the displacement of competition. It is enough . . . if suppression of competition is the 'foreseeable result' of what the statute authorizes." *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 372-73 (1991).[11]

---

[11]   To the extent that *United States v. Texas State Bd. of Pub. Accountancy*, 592 F.2d 919 (5th Cir. 1979), *aff'g* 464 F. Supp. 400 (W.D. Tex. 1978), *cert. denied*, 444 U.S. 925 (1979), suggests that the state-action exemption may be denied because the state statute authorizing the challenged conduct was cast in permissive language rather than mandatory language, the opinion has been overruled by numerous subsequent Supreme Court cases disavowing that reasoning. *See, e.g.*, *Southern Motor Carriers*, 471 U.S. at 59-60.

The evidence of the Louisiana policy supporting the rules against the practice of incompatible professions and the acceptance of commissions consists of the following statutory language:

> The board shall:
>
> * * *
>
> (3) Take appropriate administrative action to regulate the practice of public accounting in the state of Louisiana in the interest of and to preserve and protect the public health, safety and welfare;
>
> * * *

LA. REV. STAT. ANN. § 37:75(A) (West 1988).

> The board may:
>
> * * *
>
> (2) Adopt and enforce all rules and regulations, bylaws, and rules of professional conduct as the board may deem necessary and proper to regulate the practice of public accounting in the state of Louisiana, to provide for the efficient operation of the board, and otherwise to discharge its duties and powers under this Chapter;
>
> * * *
>
> (5) Authorize any member of the Board to make any affidavit necessary to the issuance of any injunction or other legal process authorized under this Chapter or under the rules and regulations of the board;
>
> (6) Employ inspectors, special agents, and investigators;
>
> * * *
>
> (8) Employ legal counsel to carry out the provisions of this Chapter, provided that the fees of such counsel and the costs of all proceedings, except criminal prosecutions, are paid by the board from its own funds;
>
> * * *

(10) Issue subpoenas under its seal to require attendance and testimony and the production of documents and things for the purpose of enforcing the laws relative to the practice of public accounting and securing evidence of violations thereof;

* * *

(12) Adopt and enforce rules and regulations providing for the board's regular, periodic review of the form of audit, review, and compilation reports issued by individuals and firms registered with the board for compliance with applicable, generally accepted standards. * * *

* * *

*Id.* § 37:75(B) (West 1988 & Supp. 1998). These statutes grant the Board broad power to regulate the profession of accounting. We must determine whether the rules challenged by the plaintiffs are a "foreseeable result" of the state's enabling legislation and therefore promote the state's public policy for the purposes of the state-action doctrine.

The plaintiffs contend that "clear articulation" is not present on these facts. They argue that the state-action doctrine is to be applied narrowly, and the Board members' actions simply do not merit the exemption. Particularly, the plaintiffs object that (1) any "policy" evidenced by the above-quoted statutory language is not "clearly articulated" and (2) the rules enacted by the Board are not the "foreseeable result" of the statues enacted by the state. The plaintiffs assert that their view is supported by Supreme Court precedent which holds that merely neutral statutory language is inadequate to meet the standards of clear articulation and affirmative expression. *See, e.g.,* **Community Communications**,

23

455 U.S. at 55-56 ("[T]he requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere neutrality respecting the municipal actions challenged as anticompetitive.").

That argument cannot be accepted. With respect to a regulated entity such as the Board, the Supreme Court has dictated a standard that accords appropriate deference to state sovereignty: "As long as the State clearly articulates its intent to adopt a permissive policy, the first prong of the *Midcal* test is satisfied." *Southern Motor Carriers*, 471 U.S. at 60. Thus, we cannot deny the state-action exemption based merely upon the failure of the Louisiana legislature to expressly state an intention to displace competition in the accounting profession by restricting the practice of "incompatible professions" and the acceptance of commissions. As the Supreme Court has noted in a analogous context, such an approach would take an "unrealistic view of how legislatures work and of how statutes are written." *Town of Hallie*, 471 U.S. at 43; *see also* AREEDA & HOVENKAMP, *supra*, ¶ 212.3a ("Unfortunately, state statutes seldom speak with clarity on [the elements of the 'clear articulation' requirement], for the federal antitrust consequences of state legislation -- especially of state delegations to subordinate units -- was hardly significant in the legislators' minds.").

Objectively, the Louisiana legislature "intended" that the Board, through its members, exercise any power which the legislature authorized. Here, the Board was authorized to "[a]dopt

24

and enforce all rules and regulations, bylaws, and rules of professional conduct as the board may deem necessary and proper to regulate the practice of public accounting in the state of Louisiana." LA. REV. STAT. ANN. § 37:75(B)(2) (West 1988). This is a broad grant of authority which includes the power to adopt rules that may have anticompetitive effects.[12] It is thus the "foreseeable result" of enacting such a statute that the Board may actually promulgate a rule that has anticompetitive effects.

Whether or not the rules challenged by the plaintiffs would violate the Sherman Act in the absence of a state-action exemption, it is plain that Louisiana has established a permissive policy with respect to the Board's regulation of CPAs. In doing so the state rejected pure competition among public accountants in favor of establishing a regulatory regime that inevitably has anticompetitive effects.

Our analysis is faithful to the principles of federalism that gird the state-action doctrine. As the Supreme Court has noted:

> If more detail than a clear intent to displace competition were required of the legislature, States would find it difficult to implement through regulatory agencies their anticompetitive policies. Agencies are created because they are able to deal with problems unforeseeable to, or outside the competence of, the legislature. Requiring express

---

[12] For example, the Board uses its state-granted monopoly power over the practice of public accounting to determine who may compete in the profession. *See* LA. REV. STAT. ANN. § 75(A) (West 1988) (the Board shall administer the licensing of CPAs)***; id.*** § 77(B) (West Supp. 1998) (CPA license required to practice public accounting in Louisiana); LA. ADMIN. CODE tit. 46, §§ XIX.1101-.2701 (Sept. 1997) <www.state.la.us/osr/lac/lac.htm> (regulations pertaining to examination, certification, and licensing). This has the effect of artificially limiting supply and therefore raising prices.

25

> authorization for every action that an agency might find necessary to effectuate state policy would diminish, if not destroy, its usefulness.

*Southern Motor Carriers*, 471 U.S. at 64. We thus conclude that the "clear articulation" requirement is satisfied by the Louisiana statutes which bless the Board with broad rulemaking authority over the profession of public accounting within the state. The members of the Board are therefore entitled to state-action immunity from federal antitrust laws.

## V. Conclusion

For the aforementioned reasons, the judgment of the district court denying defendants' motion to dismiss based on the Eleventh Amendment is reversed to the extent that it denies immunity to the Board itself and to individual Board members on claims grounded in state law. In all other respects, the ruling is affirmed. The denial of the motion to dismiss based on the state-action doctrine is also reversed. We remand the case for further proceedings. On remand, the district court shall dismiss all claims against the State Board of Certified Public Accountants of Louisiana and all federal antitrust and state-law claims against its Board members.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.