IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 19, 2020 Session

## STATE OF TENNESSEE v. ROBERT A. DOLL, III

**Appeal from the Circuit Court for Williamson County**
**No. II-CR078988-B          Mark J. Fishburn, Judge**
_____

### No. M2019-00236-CCA-R3-CD
_____

A Williamson County jury convicted the Defendant, Robert A. Doll, III, of two counts of suborning aggravated perjury and one count of criminal simulation, and the trial court sentenced him to two years of probation. The Defendant filed a motion for new trial, alleging that the indictment against him was untimely. The trial court denied the Defendant's motion, and the Defendant now appeals. On appeal, he contends that the trial court erred when it failed to dismiss the indictment as time-barred. After review, we affirm the circuit court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., J., joined. THOMAS T. WOODALL, J., concurred in the results only.

Joel Crim (at trial) and Peter J. Strianse (on appeal), Nashville, Tennessee, for the appellant, Robert A. Doll, III.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Kim R. Helper, District Attorney General; and Christopher K. Vernon, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's representation of his client in divorce proceedings. On behalf of his client, Pamela Denise Van Burkleo, the Defendant prepared and submitted an emergency ex parte petition, which purportedly contained his client's notarized signature. It was later alleged that the Defendant had forged the signature. Based on this incident, the District Attorney General, Kim R. Helper ("DA Helper"), sought a grand jury indictment in this case on July 13, 2015. In counts 1 and 2,

it alleged that Ms. Van Burkleo committed aggravated perjury by making a false statement in an official proceeding when she testified falsely under oath that a notary witnessed her sign an oath in support of her petition for an ex parte emergency restraining order. The indictment also alleged that Ms. Van Burkleo testified falsely during a show cause hearing to determine the authenticity of her notarized signature. In counts 3 and 4, the indictment alleged that, on June 18, 2013, the Defendant committed subornation of aggravated perjury with regard to the petition for the restraining order. Count 5 alleged that the Defendant committed criminal simulation on March 1, 2013.

## A. Tolling Agreement

Before trial, the Defendant moved to dismiss the indictment, arguing that the indictment was untimely. The State countered that the parties had entered into a tolling agreement, pursuant to which the Defendant waived the statute of limitations for his indictment for 180 days so that he could persuade the State not to move forward with the case. The tolling agreement was entered into on February 6, 2015, when the Defendant's attorney, Hal Hardin, sent a fax to DA Helper, marked with the subject "Tolling Agreement." In the fax, Mr. Hardin said that he had attached a "waiver" that froze "all rights for 180 days." The waiver stated:

1. Tolling. All rights and privileges of either party are frozen as of this date for 180 days. All applicable statutes of limitation, rights and privileges, if any, are tolled as of the execution of the Agreement and shall remain so while this Agreement is in full force and effect. This Agreement shall not be deemed to revive any claim that was already time-barred before the date thereof.

In the waiver, both parties acknowledged that the statute of limitations and time-related defenses were subject to being tolled and that the agreement was enforceable. It further stated that the agreement would "remain in full force and effect until the expiration of 180 days following written termination notice by any party." The tolling agreement stated that it "shall" be binding upon the parties and may "not be changed, amended, supplemented or otherwise modified in any way, in whole or in part, except by writing signed by all [p]arties." The tolling agreement would expire on Wednesday, August 5, 2015.

On March 6, 2015, the Defendant's attorney forwarded to DA Helper an offer to meet for the Defendant to make a "proffer." The Defendant expressed his desire to meet with the State and "clear up any questions" that the State might have related to this case.

- 2 -

On July 10, 2015, before the expiration of the tolling agreement, Mr. Hardin wrote a letter to DA Helper in which he stated: "In your message back, you stated that you had revisited the case and that you were now going to present the case to the [g]rand Jury." Mr. Hardin asked DA Helper to "present all exculpatory evidence to the [g]rand Jury for its consideration." He asked that DA Helper present to the grand jury "all *Brady*-type evidence." Mr. Hardin asked that the Defendant be allowed to present his side of the story to the grand jury. He closed with a reminder that this indictment could "destroy" the Defendant and his family. He stated, "If an [i]ndictment is returned we will be ready to appear in court."

DA Helper sought and obtained an indictment from the grand jury on July 13, 2015.

In January 2016, the Defendant filed a motion to dismiss the indictment based upon the State's failure to commence the prosecution within the applicable two-year statute of limitations. He noted that the two class E felonies at issue were alleged to have occurred on March 1, 2013 and June 18, 2013, respectively, and that pursuant to Tennessee Code Annotated section 40-2-101(b)(4), the State was required to commence a prosecution against him within two years, which it had failed to do. The Defendant asked that the trial court dismiss the indictments against him.

The State responded to the Defendant's motion to dismiss the indictment. In its response, the State alleged that, in February 2015, before the two-year statute of limitations expired, Mr. Hardin called DA Helper and asked if she intended to seek an indictment against the Defendant in this case. The State alleged that, on the phone call with Mr. Hardin, DA Helper informed Mr. Hardin that she could not speak with him on the matter, and he stated his desire to convince her that a prosecution against his client should be avoided. The State alleged that DA Helper informed Mr. Hardin of the statute of limitations concern, and Mr. Hardin suggested that any statute of limitations defense would be waived by the Defendant for 180 days, as memorialized in the "Tolling Agreement." The State's response included mention of the March 6, 2015, and the July 10, 2015 letter sent by Mr. Hardin proposing to extend the agreement for ninety days. In the July letter, Mr. Hardin additionally asked that the Defendant be allowed to testify before the grand jury if DA Helper sought an indictment. In the State's response, it concluded that the Defendant had agreed to waive his right to assert a statute of limitations defense.

On April 16, 2016, the trial court held a hearing on, *inter alia*, the motion to dismiss the indictment as untimely. At the hearing, the parties presented the following evidence: Timothy Carter testified that he was an attorney who was present at a show-cause hearing held on June 18, 2013 ("Show-Cause Hearing") and presided over by

Judge Timothy Easter to determine the legitimacy of Mrs. Van Burkleo's signature on a petition, which Mr. Carter had notarized. DA Helper was present at the hearing.

Hal Hardin, a criminal defense attorney, testified that the Defendant hired him, prior to being indicted by the grand jury, to represent the Defendant in a case that involved subordination of perjury and criminal simulation. In the course of his representation, Mr. Hardin called DA Helper to discuss the impending statute of limitations for the indictment, which Mr. Hardin and the Defendant wanted to postpone. After their conversation, Mr. Hardin drafted a document in which he proposed to freeze all the State's rights at that time pursuant to the statute of limitations for six months, the "tolling agreement." Mr. Hardin testified that, at the conclusion of the six months, he asked DA Helper again to give another "tolling waiver agreement that we would sign, and she declined and [he understood that] an indictment came down immediately."

Mr. Hardin testified that the tolling agreement "froze" the rights of the Defendant and of the State as of the date of entry into the agreement, February 6, 2015. Mr. Hardin identified the waiver, executed on February 6, 2015, and read aloud its provisions. Mr. Hardin said that he reviewed the waiver with the Defendant and described his understanding of the agreement as:

> It's a snapshot of all the rights and privileges that existed as of that time. Nobody is losing anything by signing this, except they've been held, they've been frozen, they've been put in abeyance, if you will, for a period of 180 days.

He stated that, had DA Helper sought an indictment after this time, he would likely have moved to quash the indictment as violating this agreement.

Mr. Hardin testified that he sent DA Helper a letter in March 2015. In it, he drafted the proposed proffer agreement. That agreement included that they would meet with Special Agent Barry Carroll, an agent with the District Attorney's office. Mr. Hardin recalled that they never met with the agent.

Mr. Hardin identified his July 10, 2015 letter in which he asked DA Helper to extend the tolling agreement by ninety days. In the letter he acknowledged that DA Helper had informed him that she had revisited the case and was now going to present the case to the grand jury. Mr. Hardin went on in the letter to ask DA Helper to also present exculpatory evidence to the grand jury for its consideration, even though such was not constitutionally mandated. He further asked in the letter that the Defendant be allowed to appear before the grand jury. DA Helper agreed to allow the Defendant to appear before

the grand jury.  Mr. Hardin said that, ultimately, his agreement with DA Helper served only to delay the Defendant's indictment.

During cross-examination, Mr. Hardin testified that his agreement with DA Helper was akin to a contract.  The contract, he said, was intended to provide the Defendant with "safe harbor" for six months.  The Defendant was indicted July 13, 2015, which was before the August 5, 2015 expiration of the agreement.

DA Helper testified that one of her responsibilities was to approve cases that appear before the various grand juries in her district.  She said that the Williamson County grand jury usually met the second Monday of every month.

DA Helper recalled the events leading up to this case saying that Judge Easter expressed concerns to her about the Defendant's actions, which led her office to begin an investigation.  Barry Carroll, an investigator with whom she worked, investigated the case, and, in February 2015, the case was ready to present to the grand jury.  Around that time, Mr. Hardin called her and encouraged her not to seek an indictment, and the two discussed the statute of limitations issue.  Mr. Hardin asked DA Helper to give them additional time to convince her not to indict the Defendant, saying that they would waive the statute of limitations.  He sent her an agreement later that day memorializing their verbal agreement.  DA Helper said that she believed that she signed a copy and sent it back to Mr. Hardin.

DA Helper identified a copy of the proffer agreement and said that she would have sent it directly to Investigator Carroll.  To her knowledge, nothing came of this letter or proffer agreement.  DA Helper identified the letter sent to her by Mr. Hardin in which he asked that the Defendant be given the opportunity to testify at the grand jury.  DA Helper said that she informed the Grand Jury foreman of the Defendant's request, and he agreed to hear from the Defendant.  She said she was not present at the meeting of the grand jury but that the deputy district attorney who presented the case, Terry Wood, informed her that the Defendant had in fact testified before the grand jury.

DA Helper agreed that the tolling agreement was set to expire on August 5, 2015.  She acknowledged that the language in the agreement stated that it could be changed by written notice, and she did not recall offering Mr. Hardin anything in writing.  She said, however, that she and Mr. Hardin were in agreement, as reflected by his letter offering to extend the limitations period an additional ninety days.

During cross-examination, DA Helper said that both parties made mutual promises in the tolling agreement.  She said that Mr. Hardin knew the dates that the grand jury convened, so he was aware that the July meeting was the last before their agreement

expired. She said that the two discussed extending the agreement because Mr. Hardin "was aware that [the July meeting of the grand jury] was going to be my date." She agreed that she would not have presented the case to the grand jury without contacting Mr. Hardin. She again stated that she did not have a signed copy in her file.

During redirect examination, DA Helper testified that Mr. Hardin did not protest when she called him to say that she was going to present the case to the grand jury in July. She said that they both knew that the tolling agreement was set to expire before the grand jury convened in August. The last grand jury opportunity before the agreement's expiration was the July date, which led to their phone conversation and Mr. Hardin's letter. She stated that there "was not . . . any disagreement that there was some sort of requirement that it had to wait until the exact 180 days. The [statute of limitations] was tolled for 180 days and that's why the case went to the grand jury in July."

Based upon this evidence, the trial court denied the Defendant's motion to dismiss the indictment. It found:

> The court finds that the waiver of statute of limitations entered in this case was valid. It meets the requirements of *State v. Pearson*, in that it was knowingly and voluntarily entered. *Pearson*, 858 S.W.2d 879 (Tenn. 1999). The State's response included a copy of this waiver signed by the Defendant and his attorney. Additionally, Mr. Hardin testified that he would never seek a waiver of the statute without the full knowledge and authorization of the client. There is no copy of the waiver signed by the District Attorney in the record, but testimony shows the District Attorney did sign this agreement at some point, and that she relied on it by not presenting the case to the [g]rand [j]ury in February of 2015. Additionally, [DA] Helper's testimony at the hearing in this case established that this case was presented to the grand jury on July 13, 2015, their last meeting of the grand jury before the 180 day waiver expired. The Defendant and his attorney received notice of the pending presentment in time to request an extension and request that the Defendant be allowed to testify before the grand jury in the event an extension was rejected. The extension was denied, but the Defendant was granted his request to testify. It appears that the Defendant received the benefit of his bargain in waiving the statute of limitations, and that the District Attorney relied upon his waiver.

> The court also finds that the reasoning of the District Attorney in regards to the tolling language not being included in the indictment persuasive. . . . [I]n this case, it would be disingenuous for the Defendant to request an extension of time to attempt to persuade the State not to indict,

execute a valid waiver, and then claim to have no notice of why he was indicted past the statute of limitations.

The Defendant sought, but this court ultimately denied, an interlocutory appeal. A trial ensued.

## B. Trial

On appeal, the Defendant does not contest the sufficiency of the evidence to support his convictions for suborning aggravated perjury and criminal simulation and only appeals the issue regarding the timeliness of the indictment. We will therefore briefly summarize the facts presented by the State at trial.

The Defendant practiced family law as a licensed attorney in the State of Tennessee. On March 1, 2013, Ms. Van Burkleo filed an emergency ex parte petition seeking to prevent her ex-husband, Mr. Van Burkleo, from exercising his visitation with their children. Attached to the petition were two affidavits, one from each of their teenage sons. Ms. Van Burkleo's purported affidavit was included within the petition and therefore was a part of the petition. Ms. Van Burkleo's signature was notarized by Mr. Tim Carter, a Davidson County notary, and the Defendant signed as her attorney. On the basis of this petition, Judge Beal granted an order restraining Mr. Van Burkleo from exercising his parenting time with the Van Burkleos' minor children, pending further order of the court. Judge Beal set a hearing for this case on March 26, 2013.

Judge Beal, the judge who granted the emergency ex parte petition testified that, if the emergency ex parte petition lacked an affidavit, the clerk's office would not submit it to the judge for review and the judge would refrain from reviewing it. A forged affidavit invalidated the petition. The affidavit required that the affiant "swear" to the facts as stated, as shown by their notarized signature. Judge Beal explained that judges trust the notarized signature to the same extent as if the affiant came before them and swore the same facts under oath. If the facts sworn to are untruthful, the court has the authority to punish the person who perpetrated the falsehood, such as holding the affiant in contempt or charging them with perjury.

On March 26, 2013, Judge Timothy Easter conducted a hearing, at which there was no court reporter, to determine if Ms. Van Burkleo's restraining order should be extended or resolved. At the hearing, the Defendant's associate, Ms. Emily Trodoran represented Ms. Van Burkleo, and Mr. Van Burkleo proceeded *pro se*. Ms. Van Burkleo testified under oath that she had not signed the petition. Judge Easter said that he directly asked Ms. Van Burkleo if she signed the petition for a restraining order in front of a notary, and she responded that she had not. Based upon this testimony, Judge Easter

ordered that the restraining order not be extended and stated his desire to hear from the Defendant on the issue and reset the case for April 23, 2013.

Judge Easter recalled that, at the April 23, 2013 hearing, the Defendant appeared. He was not under oath, but he told the judge that Ms. Van Burkleo was in his office the day that the petition was signed, and she had reviewed it. He said he did not know why Mr. Carter would notarize a signature that was not that of Ms. Van Burkleo. Judge Easter informed the Defendant that he and the notary were facing potentially criminal allegations, so they may want to seek representation.

Judge Easter asked DA Helper to be present at the next hearing, held May 7, 2013. There, and again not under oath, the Defendant stated that his calendar indicated that he prepared the petition on March 1, 2013, two hours before Ms. Van Burkleo arrived in his office at 3:00 p.m. to review and sign the documents. At this hearing, Mr. Blair Durham was present to represent Mr. Carter, and said that Mr. Carter was Mr. Durham's employee. Judge Easter continued the case until June 18, 2013.

At the next hearing, on June 18, 2013, Ms. Sandra Wells, a criminal defense attorney, represented Mr. Carter. Ms. Wells called Ms. Van Burkleo to testify. Ms. Van Burkleo testified that she had, in fact, signed the March 1, 2013 petition. She said that her response at the hearing to questioning by Mr. Van Burkleo and Judge Easter was that her signature "looked different" on the petition. She, however, testified under oath that it was, in fact, her signature on the petition and that she had signed the petition in front of Mr. Carter. She then testified that she would change her signature from time to time.

At the hearing, the Defendant also questioned Ms. Van Burkleo about whether she had "come in [his] office . . . with all three children on March the 1st to sign the petition," and Ms. Van Burkleo responded affirmatively. Judge Easter said that Ms. Van Burkleo's answer was not consistent with her previous testimony under oath. The Defendant went on to ask Ms. Van Burkleo if Mr. Carter was present and notarized her signature on March 1, 2013, and Ms. Van Burkleo again responded affirmatively. With hesitation, but because the only direct evidence on the issue was Ms. Van Burkleo's testimony, Judge Easter informed Mr. Carter and the Defendant that there was no longer an issue regarding the signature on the petition.

Evidence was presented from Ms. Van Burkleo's place of employment that she was present at work at the time that the petition was signed and notarized. The State offered several sample signatures by the relevant parties. Mr. Carter, who had since become a licensed attorney, told investigators and testified at trial that he did not recall any events surrounding the March 1, 2013, petition, including whether he notarized the signatures of Ms. Van Burkleo or the Defendant.

Ms. Van Burkleo testified that the Defendant represented her for part of her divorce proceedings. After the divorce, Ms. Van Burkleo sought to change the visitation because she was concerned for the physical and mental safety of her children. She agreed that at the March 26, 2013 hearing, she said that the signature on the petition was not her signature. She said she told Judge Easter that she had no idea who had signed the document.

Ms. Van Burkleo said that, the following day, the Defendant called her and seemed irritated and said "don't you remember giving me permission to sign your name?" She told him that she did not and further that she did not have an email indicating as much, which was the usual course of her arrangement with the Defendant. She thought the Defendant sounded irritated and very short. Ms. Van Burkleo said this was the first she learned that it was the Defendant who had signed her name.

Ms. Van Burkleo was extremely concerned for her children, so the Defendant filed a second emergency petition on her behalf. During the course of their discussions, the Defendant told Ms. Van Burkleo that attorneys sign documents for clients frequently and that he might get a minor reprimand but, since the contends of the affidavit were true, there would be no harsh punishment. The Defendant then told her during their phone conversation, "you just say, you know, all those documents that you saw, all your signatures look different, but that they're all yours." The Defendant also told her that Mr. Carter could get in trouble and lose his job if Ms. Van Burkleo did not say that it was her signature. Ms. Van Burkleo said that, on the day of the hearing, the Defendant met her outside the courtroom and reminded her that Mr. Carter could lose his job and instructed her how to testify. He never informed her that she could get into trouble for lying under oath. Instead, he gave her the impression that it was fine because the contents of the affidavit were in fact true. She said that she trusted him, and she testified that all of the signatures on the petitions, including the March 1, 2013 petition, belonged to her.

Ms. Van Burkleo said that she never went to the Defendant's office at all on March 1, 2013. She never signed the affidavit petition in the presence of Mr. Carter. She agreed that she perjured herself when she said otherwise. She had been indicted for two counts of aggravated perjury.

A handwriting expert testified that Ms. Van Burkleo's known signature was not similar to the one on the petition. He further opined that, after examining known signatures of the Defendant, it appeared that it was the Defendant who signed Ms. Van Burkleo's signature on the petition.

The Defendant testified on his own behalf that he had the petition ready to go and left it for Ms. Van Burkleo to sign. He assumed that she did so. He denied ever asking Ms. Van Burkleo to testify that she had signed the petition or that Mr. Carter had notarized her signature.

In his testimony, the Defendant raised the statute of limitations defense, saying that DA Helper indicted him more than two years after this offense. He stated that he, through his criminal attorney, offered to speak with the DA's investigator if she would agree to wait to indict him, referring to the letter that was the subject of the pretrial litigation. He testified that neither he nor his attorney ever received a signed copy of DA Helper's agreement to any delay in indicting the Defendant.

During the Defendant's cross-examination, the Defendant agreed that he told Judge Easter at the April 23, 2013, hearing that Ms. Van Burkleo was in his office on March 1, 2013, at 3:00 p.m. to sign the emergency ex parte petition. He agreed that he questioned his own client, Ms. Van Burkleo, about whether she came to his office on March 1, 2013. Her answer resulted in her being charged with aggravated perjury and also being prosecuted civilly for over a million dollars by Mr. Van Burkleo. The Defendant maintained that he did not know who had signed the emergency ex parte petition. He agreed, however, that some of the "slants" and "angles" of his own signature mirrored those of the signature purported to be of Ms. Van Burkleo on the petition. He agreed that the signature on the petition did not look like any other that he had seen from Ms. Van Burkleo.

The Defendant adamantly maintained that DA Helper never signed the tolling agreement that was meant to toll the statute of limitations. He agreed that a subsequent letter from his attorney referred to their "agreement," but he said this letter said that they would extend the tolling agreement but that there was never an agreement. The Defendant agreed that he did, in fact, get notice from the DA's office that it intended to go to the July meeting of the grand jury, and he testified before the grand jury on his own behalf.

DA Helper testified for the State in rebuttal. She said that her office investigated the case involving the emergency ex parte petition, which it appeared contained a forged signature. She said that the two-year statute of limitations would have run in March 2015, but she entered into a tolling agreement with Mr. Hardin, the Defendant's attorney, pursuant to which their rights were frozen for 180 days, so the Defendant could attempt to convince her not to move forward with the case. DA Helper identified and read for the jury the tolling agreement. She said that she signed this agreement and faxed it back to Mr. Hardin, but she admitted that she did not have a copy of the signed agreement. She testified, however, that during the course of the next 180 days both parties acted as if the

document had been signed and the agreement entered into, which confirmed for her that she had actually done so.

DA Helper testified that the tolling agreement would have expired before the grand jury convened in August 2015. She therefore contacted Mr. Hardin and informed him that she intended to present the case to the grand jury in July 2015. He sent her a letter in response, offering to extend the tolling agreement ninety days and stating that, in the alternative, could the Defendant be allowed to testify before the grand jury.

Mr. Hardin testified also and said that when the Defendant hired him the statute of limitations was about to run, and that he was likely going to be indicted. Mr. Hardin said that they wanted more time to get their defense together and potentially convince DA Helper not to seek an indictment. He therefore proposed by letter the tolling agreement, which he could not recall if she had signed. He said, however, that both parties agreed to the terms contained in the tolling agreement, and he believed that it was enforceable against them both whether or not it was signed. Both parties, he said, acted as if the agreement was in effect. In Mr. Hardin's opinion, the Defendant got what he had bargained for pursuant to the agreement because he was not charged for another 180 days. Mr. Hardin confirmed that the Defendant knew about this agreement and had asked to extend it.

Mr. Hardin said that he understood that DA Helper was going to present the case to the grand jury in July because that was her last opportunity to do so before the expiration of the tolling agreement. He discussed this with the Defendant, who was on a hunting trip out west, and they decided to ask for a ninety-day extension of the tolling agreement or, in the alternative, that the Defendant be allowed to testify before the grand jury. DA Helper denied the extension but granted the request to allow the Defendant to testify.

During deliberations, the jury asked the judge the following question:

During the 180[-]day toll/freeze period, did the DA have the right to indict? Number 2, if the DA did not have the right to indict at the end of the tolling period, what happens? Could she indict then?

The judge informed them that they were the sole deciders of the facts and the law. The jury convicted the Defendant of two counts of subornation of aggravated perjury and one count of criminal simulation.

## II. Analysis

On appeal, the Defendant contends, as he did in the trial court and before the jury, that the tolling agreement was invalid because it was not signed by DA Helper and thus there was no meeting of the minds on the issue. He next contends that the State breached the tolling agreement by seeking an indictment prior to the expiration of the 180-day agreement, although the July meeting of the grand jury was the last meeting of the grand jury before the tolling agreement expired.

Parties may enter into a "tolling agreement" whereby the defendant agrees not to plead the statute of limitations. *Tenn-Fla Partners v. Shelton*, 233 S.W.3d 825, 829 (Tenn. Ct. App. 2007). This type of agreement is civil in nature, and the cases in our State that have interpreted tolling agreements therefore arise from the civil side of our courts. Tolling agreements are governed by contract law, and their interpretation requires the court to ascertain the intent of the parties. *Id.* If the contract is plain and unambiguous, the meaning thereof is a question of law, and it is the court's function to interpret the contract as written according to its plain terms. *Petty v. Sloan*, 197 Tenn. 630, 277 S.W.2d 355 (1955). If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. *Sutton v. First Nat'l Bank of Crossville*, 620 S.W.2d 526 (Tenn. Ct. App. 1981); *see also Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009). Courts cannot make contracts for parties but can only enforce the contract which the parties themselves have made. *McKee v. Continental Ins*. Co., 191 Tenn. 413, 234 S.W.2d 830, 22 ALR2d 980 (1951).

As with all contracts, our goal is to "ascertain and give effect to the parties' intentions in entering into the agreement based on the plain meaning of the agreement''s language." *Circle C Constr., LLC v. Nilsen*, 484 S.W.3d 914, 917 (Tenn. 2016). If the language used is unambiguous, we will enforce it as written. *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013); *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). Contract interpretation is a question of law, which we review de novo with no presumption of correctness. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 703 (Tenn. 2008).

The first issue before this court is whether the tolling agreement is valid despite the fact that there was not a signed copy of the tolling agreement presented. DA Helper testified that she recalled signing a copy of the agreement and asking her administrative assistant to send her signed copy of it back to Mr. Hardin. Mr. Hardin testified that he did not recall receiving a signed copy but stated that both parties acted and relied upon the tolling agreement. "A contract must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Stauback Retail Services-Southeast, LLC v. H.G. Hill Realty Co.*, 160 S.W.3d

- 12 -

521, 524 (Tenn. 2005) (citations omitted). "In determining mutuality of assent, courts must apply an objective standard based upon the parties' manifestations." *Id.* In the context of tolling agreements, we find instructive a case from Mississippi, in which the court addressed whether an unsigned tolling agreement was valid:

> The Court first concludes that the contracts were valid. "Whether an unsigned writing constitutes a binding contract depends upon the intention of the parties." *Turney v. Marion Cnty. Bd. of Educ.*, 481 So. 2d 770, 774 (Miss. 1985). Even where the signature is lacking, assent "may be shown in other ways, as, for example, by the acts or conduct of the parties." *Id.* (citing 17 C.J.S. Contracts § 62 (1963)). The parties to this case demonstrated mutual assent by their conduct. Most notably, the Secretary [of the United States Department of Labor] never sued until notice was given under the terms of the tolling agreements, and Defendants acknowledged the existence of, and their assent to, the 2008 Tolling Agreement when they expressly extended it in the 2009 Tolling Agreement. *See* 2009 Tolling Agreement [286-4] (acknowledging that parties "previously entered into an Agreement to Toll the Running of the Statute of Limitations which tolled ERISA's statute of limitations . . ." and expressing mutual "desire to extend the tolling").

*Seth D. Harris, Acting Secretary of the United States Department of Labor v. Herbert C. Bruister*, 2013 WL 6805155, at*7 (E.D. Miss. Dec. 20, 2013).

Similar to *Bruister*, in this case the Defendant asked for an extension of the tolling agreement, which DA Helper denied. It was clearly the intention of the parties herein that the tolling agreement existed and that it was intended to "freeze" the rights of the parties for 180 days.

Accordingly, we now turn to the interpretation of this tolling agreement. The Defendant would have us read the plain language of the agreement to be that this was actually a contractual agreement between DA Helper and himself precluding DA Helper from seeking an indictment against the Defendant while the tolling agreement was in effect. The Defendant entered into the 180-day tolling agreement on February 5, 2015, meaning it would have expired on August 4, 2015. The Williamson County grand jury convened around that time on the second Monday of the month. The grand jury therefore met on July 13, 2015 and August 10, 2015. According to the Defendant's interpretation of the contract, the parties intended for the agreement to expire on August 4, 2015, before the August meeting of the grand jury, and DA Helper could not seek an indictment until after that date. This interpretation could mean that DA Helper had no ability to indict the Defendant at all, because had she waited until the August 10, 2015 meeting of the grand

- 13 -

jury, the Defendant would argue that the agreement had expired and the statute of limitations had run.

We find more persuasive the State's interpretation of the agreement, which comports with the Defendant's attorney's trial testimony, and which includes that the parties agreed to a tolling of the statute of limitations for 180 days. That agreement would necessarily include that, at DA Helper's last opportunity before the agreement expired, she could seek an indictment against the Defendant rather than lose the ability to indict him at all. Mr. Hardin's letter wherein he acknowledged receiving notice from DA Helper that she intended to move forward with the case at the July grand jury is evidence that this was what the parties contemplated. Mr. Hardin, representing the Defendant, asked for an extension of the tolling agreement and, in the alternative, the opportunity for the Defendant to testify before the grand jury. Mr. Hardin's letter said: "If an [i]Indictment is returned we will be ready to appear in court."

DA Helper notified the grand jury of the Defendant's request to testify, and the grand jury heard the Defendant's testimony on July 13, 2015. Both the Defendant and Mr. Hardin acted in accordance with DA Helper having the authority to seek an indictment at the July grand jury. Mr. Hardin neither notified her nor asserted that their agreement included that she must wait until the August grand jury to seek an indictment against the Defendant. The Defendant was allowed to testify on his own behalf before the July grand jury. DA Helper acted within the plain meaning of the tolling agreement, as evidenced by her stated understanding of the agreement and the actions and statements by the Defendant and his attorney regarding her seeking an indictment from the grand jury in July. We conclude that DA Helper did not "breech" the tolling agreement, and we agree with the trial court that "the Defendant received the benefit of his bargain in waiving the statute of limitations and that the District Attorney relied upon his waiver." The Defendant is not entitled to relief on this issue. We affirm the trial court's denial of his motion to dismiss the indictment.

## III. Conclusion

Based on the foregoing authorities and reasoning, we conclude that the trial court did not err when it denied his motion to dismiss the indictments against him.

_____
ROBERT W. WEDEMEYER, JUDGE